969 A.2d 1097

SOPHARIE LEANG AND SONG LEANG, PLAINTIFFS–RESPONDENTS, v. JERSEY CITY BOARD OF EDUCATION, VLADIMIR ASHWORTH, CHARLES T. EPPS, JR., (IN HIS CAPACITY AS VICE PRINCIPAL) AND ANGELA BRUNO, DEFENDANTS–APPELLANTS, AND JANE AND JOHN DOES 1–5, DEFENDANTS.

SOPHARIE LEANG AND SONG LEANG, PLAINTIFFS–RESPONDENTS, v. JERSEY CITY MEDICAL CENTER MOBILE CRISIS UNIT AND THE JERSEY CITY MEDICAL CENTER, DEFENDANTS–APPELLANTS, AND JERSEY CITY POLICE DEPARTMENT, JOHN AND JANE DOES 1–5 BEING EMPLOYEES OF THE JERSEY CITY MEDICAL CENTER MOBILE CRISIS UNIT AND/OR THE JERSEY CITY MEDICAL CENTER AND JOHN AND JANE DOES 6–10 BEING EMPLOYEES OF THE JERSEY CITY POLICE DEPARTMENT AND CITY OF JERSEY CITY, DEFENDANTS.

Argued January 5, 2009—Decided April 16, 2009.

558

562

*Howard M. Nirenberg,* argued the cause for appellants Jersey City Board of Education, *Vladimir Ashworth, Charles T. Epps, Jr.* and *Angela Bruno* (*Nirenberg & Varano,* attorneys; *Mr. Nirenberg* and *Sandra N. Varano,* on the briefs).

*Catherine J. Flynn Tafaro,* argued the cause for appellants Jersey City Medical Center Crisis Unit and Jersey City Medical Center (*Lindabury, McCormick, Estabrook & Cooper,* attorneys; *Ms. Flynn Tafaro* and *Monica Vir,* on the briefs).

*Daniel W. Sexton,* argued the cause for respondents.

*Karen L. Jordan,* Deputy Attorney General, argued the cause for *amicus curiae* State of New Jersey (*Anne Milgram,* Attorney General of New Jersey, attorney; *Nancy Kaplen,* Assistant Attorney General, of counsel; *Ms. Jordan* and *Larry R. Etzweiler,* Deputy Attorney General, on the brief).

Justice HOENS delivered the opinion of the Court.

Recent events around our nation and here in New Jersey have made it clear that children in our schools are vulnerable to dangers that many of us could not have even imagined when we were growing up. In response to that sad reality, our school systems, often in cooperation with law enforcement personnel, have embraced a variety of means and methods designed to return our neighborhood schools to the relatively safe havens long believed to be most conducive to effective education. Those efforts have much to commend them. At the same time, however, those same strategies often impact on the freedoms once enjoyed, and long cherished, by both the students and those who work in our schools. Creating mechanisms to ensure that our children, our educators, and our other school employees can learn and work in an atmosphere that is both safe and nurturing while, at the same time, maintaining a system that protects the rights of all of them, are not mutually exclusive goals. Rather, they are goals that,

although sometimes in apparent conflict, nonetheless can and must be harmonized.

Today we are confronted with a factual setting in which we must balance those important rights and responsibilities in one such apparent conflict. This matter stands at the intersection between the rights of a school employee who, it is alleged, uttered words that threatened the safety of the children then in her care, and the obligations of the other school employees who claim to have heard those words or who, when advised of them, exercised what they believed was their authority to act to ensure the safety of those students. That the school employee's words may have been misunderstood, that the other school employees or authorities might have had other options available to them for dealing with the perceived threat, are but a part of the fabric against which we must analyze these important goals and interests in the specialized setting of our public schools.

## I.

The claims for relief set forth by plaintiff Sopharie Leang and her spouse, Song Leang, arise from a complex series of events relating to plaintiff [1] Sopharie Leang's employment as a teacher of English as a Second Language (ESL) in a Jersey City elementary school. Because the factual assertions are recited at length in the Appellate Division's published opinion, *Leang v. Jersey City Bd. of Educ.*, 399 *N.J.Super.* 329, 944 *A.*2d 675 (App.Div.2008), we need not reiterate them. Instead, for purposes of our review, we elect to summarize only the salient facts and those as to which our review of the record differs from that of the appellate panel. Nevertheless, because this matter comes to us in the context of a

---

[1] All of the facts relate to plaintiff Sopharie Leang; because plaintiff Song Leang's only involvement in this matter arises from his per quod claim, our references to plaintiff throughout will refer only to Sopharie Leang.

motion for summary judgment, we recite our summary in the light most favorable to plaintiff.[2]

Plaintiff, who was born and raised in Cambodia, where she asserts her family was victimized by the Khmer Rouge, emigrated to this country and achieved an advanced degree in foreign languages. She was hired, pursuant to a one-year contract, by defendant Jersey City Board of Education, as a provisional teacher, *N.J.S.A.* 18A:26-2a(a), of ESL. At the time, defendant Charles T. Epps, Jr. was the Superintendent of Schools, defendant Angela Bruno was the principal of the school where plaintiff was assigned, and defendant Vladimir Ashworth was another ESL teacher. Plaintiff asserts that Ashworth sexually harassed her, that she rebuffed his advances, and that she complained about him to some of the other teachers. She concedes that she did not heed the advice of her acquaintance, an attorney in New York, who suggested that she make a complaint about Ashworth to Bruno.

On May 14, 2002, plaintiff was advised in writing that her contract would not be renewed for the following year. She did not

---

[2] We would be remiss if we did not comment briefly on the fact that plaintiff's failure to comply with the dictates of *Rule* 4:46–2(b) either in a timely manner or in the fashion demanded by that *Rule* made any analysis of her essential factual allegations more complex than necessary. That shortcoming, which led the motion judge to deem all of defendants' factual assertions to have been admitted, rather than to impose a sanction, however, resulted in an inadvertent failure by the motion judge to recognize that the moving papers themselves demonstrated significant factual disputes. Those factual disputes alone should have resulted in a denial of some of the requested relief. Moreover, as the Appellate Division pointed out, in the context of a voluminous, factually complex record, deeming facts to be admitted, although perhaps more expedient, did not in these circumstances, achieve substantial justice. We again reiterate that we expect parties to comply with the dictates of *Rule* 4:46–2(b) rather than hope for mercy when they do not, and we encourage the use of sanctions to enforce compliance where appropriate in place of a reflexive grant of dismissal. *See Lyons v. Twp. of Wayne*, 185 *N.J.* 426, 435–36, 888 *A.*2d 426 (2005). At the same time we caution all counsel that we will not continue to condone refusal or failure to comply. Rather, it is only because a close review of the papers referred to by the moving parties themselves would have demonstrated the existence of genuine issues of material fact that we concur with the Appellate Division's conclusion that the motion judge should have looked further.

request a statement of reasons or otherwise challenge the non-renewal decision. As part of this litigation, however, she asserts that Ashworth did not give her the ESL textbooks that she needed and that Bruno did not provide her with a mentor, both of which interfered with her job performance and negatively impacted her evaluations, and both of which, she alleges, were motivated by Ashworth, who sought revenge for her refusal of his advances.

The events that give rise to plaintiff's essential factual allegations took place on June 24, 2002, which was the last day of the school year. All parties agree that plaintiff and Ashworth were in a classroom, along with two teaching assistants and twenty-two students, and that Ashworth asked plaintiff what had happened to her voice. Plaintiff asserts that she told him that she had laryngitis, and that, as the discussion between them continued, she said that it was caused by stress. According to plaintiff and one of the witnesses, when Ashworth pressed her about that comment and about the cause of her stress, she said, "my doctor said the amount of stress in my body could have killed some people." Ashworth, however, insists that plaintiff initiated the conversation and, more to the point, that plaintiff said to him "I'm so stressed out that I can kill twenty-two people."

Ashworth was alarmed by that statement in light of what he described as plaintiff's "bizarre behavior" and her "stressed out and . . . very unkempt" appearance. Believing that plaintiff had uttered a threat to the safety of the students in the room, he immediately reported what he had heard to the school nurse, and eventually to Bruno. Based on Ashworth's report, plaintiff was escorted to the nurse's office. Apparently plaintiff believed that if she went to the nurse's office and awaited Bruno's return from the graduation ceremony that was then underway, she would be rehired for the following year. When Bruno and the school board's social worker attempted to speak with plaintiff about what Ashworth reported had happened, and about what was troubling her, she became distraught.

At the time of those events, the Board was a signatory to a document entitled "A Uniform State Memorandum of Agreement Between Education and Law Enforcement Officials" (the Agreement), which had been adopted by the Board and approved by both the Department of Law and Public Safety and the Department of Education. Section 1.2 of the Agreement, titled "Nature of the Problem," declares: "[r]ecent events in New Jersey and throughout the nation have made clear that while schools are generally safe places for students and staff members, a wide range of offenses are occasionally committed on school property, during operating school hours." That section further provides that the signatories recognize that any such offense, including "the actual or threatened infliction of bodily injury . . . not only undermines the educational environment, but can directly endanger the safety and well-being of members of the school community." Because of those concerns, the parties also agree that an event of that type "requires an appropriate and decisive response."

In order to effectuate its purposes, Section 4.10 of the Agreement requires school officials to immediately notify the Jersey City Police Department,

whenever any school employee in the course of his or her employment develops reason to believe that a student has threatened, is planning, or otherwise intends to cause death, serious bodily injury, or significant bodily injury to another person under circumstances in which a reasonable person would believe that the student genuinely intends at some time in the future to commit the violent act or to carry out the threat.

Although the Agreement addressed perceived threats by students rather than by a faculty member, defendant Jersey City Police Department's Emergency Services Unit (ESU) was summoned in response to plaintiff's behavior. Because it had been reported to ESU that there was an "emotionally disturbed person" at the school, when ESU arrived, it was accompanied by defendant Jersey City Medical Center Mobile Crisis Unit and its Emergency Medical Technicians (EMTs). According to Steven Nacim, one of the EMTs, plaintiff was "irate," "upset," and "frantic," and reported that she had a history of hypertension. When she allowed him to do so, Nacim took her blood pressure and found that it was

elevated. Nacim testified that a police officer accompanied them when they took plaintiff to the hospital for an evaluation and that they changed their route to accommodate plaintiff's request that they take her to a different hospital.

Hospital personnel performed both a physical examination and a psychiatric evaluation. Although plaintiff alleges that she was repeatedly kicked at the school by the police with the result that she sustained "seventy-two bruises" and was bleeding, the emergency room records of her physical examination include neither a reference to, nor any other indication of, either bleeding or bruises. Instead, those records reveal that plaintiff was suffering from high blood pressure and that the psychiatric evaluation included an Axis I diagnosis of "generalized anxiety, rule out homicidal ideation."

In spite of those findings and the treatment recommendations of the physicians relating to her elevated blood pressure, plaintiff left the hospital that evening against medical advice. She never underwent any other medical or psychiatric evaluation thereafter and received no treatment of any kind in connection with those events.

## II.

Plaintiff's original complaint named only the Jersey City Board of Education, Epps, Bruno, and Ashworth as defendants (the school defendants) and included eleven counts, all directed to the Board of Education.[3] The counts are: (1) false imprisonment; (2) battery; (3) assault; (4) invasion of privacy, alleged to have been a "strip search" and psychiatric examination performed at the hospital; (5) defamation, libel, and slander, asserted to be based on the "notorious manner of the accusations that amount to malice per se"; (6) sexual harassment and retaliation, the latter of which is

---

[3] We recite these counts at some length because the pleading does not conform with the articulation utilized by the Appellate Division in ways significant to our analysis.

asserted to be poor performance reviews that led to her non-renewal; (7) breach of her employment contract; (8) violation of due process, asserted to have been a deprivation of her property interest in her employment; (9) wrongful discharge and constructive discharge; (10) intentional infliction of emotional distress; and (11) a per quod claim asserted by her spouse.

Plaintiff's second, separately filed complaint, which was later consolidated with the original complaint, named only the Jersey City Medical Center Mobile Crisis Unit, the Jersey City Medical Center (the medical defendants), Jersey City Police Department,[4] John and Jane Does described as employees of the Jersey City Police Department and City of Jersey City. That complaint included five counts, as follows: (1) acts taken under color of law and excessive use of force and abuse of governmental authority; (2) per quod; (3) false arrest; (4) malicious prosecution; and (5) intentional infliction of emotional distress.

Following discovery, defendants successfully moved for summary judgment, essentially based on the motion judge's analysis of qualified immunity and an alternative analysis relating to an absence of evidence supporting damages. The Appellate Division, in its published opinion,[5] affirmed in part and reversed in part. *See Leang, supra,* 399 *N.J.Super.* at 380, 944 *A.2d* 675. In its analysis, the Appellate Division reviewed the matter indulgently, permitting plaintiff to rearticulate many of her claims, in some ways resulting in dramatically different assertions of law and fact than had been pleaded or raised before the motion judge. In deciding the appeal, the Appellate Division divided the claims into several broad categories, which can be summarized as the federal

---

[4] The record reflects that plaintiff reached a settlement with Jersey City and the Jersey City Police Department, including the ESU, prior to the filing of the appeal.

[5] Portions of the appellate decision were not published pursuant to *Rule* 1:36–3. To the extent relevant to our analysis, those portions are summarized in greater detail throughout.

claims, *see* 42 *U.S.C.* § 1983, the state law tort claims, the state law discrimination and employment claims, and the claims directed to the medical defendants.

In analyzing the federal causes of action, the appellate panel recognized that plaintiff had abandoned any Fourth Amendment argument. Using instead a Fourteenth Amendment analysis, the panel reinstated the federal claims against Bruno and Ashworth. *Leang, supra,* 399 *N.J.Super.* at 360–62, 944 *A.*2d 675. The panel concluded that their actions fell outside the protections of qualified immunity because they violated plaintiff's clearly established Fourteenth Amendment rights to liberty and due process. *See Saucier v. Katz,* 533 *U.S.* 194, 202, 121 *S.Ct.* 2151, 2156, 150 *L.Ed.*2d 272, 282 (2001). Reasoning in the alternative, the panel found no basis to afford either Bruno or Ashworth immunity protection against the federal claims because it concluded that they did not act in good faith. *Leang, supra,* 399 *N.J.Super.* at 361, 944 *A.*2d 675. However, the panel affirmed summary judgment in favor of the Board on the federal claims. In doing so, the panel found that because the Agreement applied only to actions to be taken in response to threats by students, it could not constitute an official Board policy that was used to violate plaintiff's due process rights, thus eliminating any respondeat superior liability for the acts of the Board's employees. *Id.* at 362, 944 *A.*2d 675.

The panel also reinstated plaintiff's state law claims for false arrest, assault and battery, defamation, invasion of privacy, and intentional infliction of emotional distress, and it revived her claim for punitive damages and her spouse's per quod claim. *Id.* at 371, 944 *A.*2d 675. In analyzing those claims, the panel concluded that Bruno and Ashworth were not entitled to qualified immunity as to any of the state law tort claims and that because the verbal threshold of the Tort Claims Act (TCA), *N.J.S.A.* 59:3–3, excludes willful acts, it could not bar plaintiff's intentional tort claims. *Leang, supra,* 399 *N.J.Super.* at 365–72, 944 *A.*2d 675.

Turning to plaintiff's employment claims, the panel affirmed in part and reversed in part. First, the panel affirmed the dismissal

of all claims against Epps. *Id.* at 360, 944 *A.*2d 675. The panel also affirmed the dismissal of plaintiff's employment discrimination claims, finding no evidence that Bruno or the Board knew or should have known of the allegedly harassing conduct by Ashworth, and the dismissal of her common law wrongful discharge claim, finding that it could not be sustained because plaintiff failed to allege a violation of a clear mandate of public policy. *See Pierce v. Ortho Pharm. Corp.*, 84 *N.J.* 58, 72, 417 *A.*2d 505 (1980). As to the contractual employment claims, the panel applied the New Jersey Contractual Liability Act, *N.J.S.A.* 59:13–1 to –10, to support its decision to affirm the dismissal of those claims against Bruno and Ashworth because they were not parties to the employment contract. *Leang, supra,* 399 *N.J.Super.* at 371, 944 *A.*2d 675. However, the panel reinstated the breach of contract claim against the Board by using an implied-in-fact contract theory pursuant to which the Board could be liable for certain economic damages plaintiff might be able to establish. *Id.* at 371–72, 944 *A.*2d 675.

The appellate panel then considered the series of claims made against the medical defendants. The court affirmed the grant of summary judgment in favor of the JCMC Mobile Crisis Unit (MCU), finding no evidence that it performed a clinical screening of plaintiff. *Id.* at 374, 944 *A.*2d 675. The panel reversed the grant of summary judgment in favor of the EMTs, however, concluding that they were not entitled to immunity under either the Good Samaritan Act, *N.J.S.A.* 2A:62A–1, or Title 30, *see N.J.S.A.* 30:4–27.7. *Leang, supra,* 399 *N.J.Super.* at 375–78, 944 *A.*2d 675. As a result, the panel also reinstated the claims against the EMTs for punitive damages. *Id.* at 379, 944 *A.*2d 675.

We granted the separate petitions for certification filed by the school defendants and the medical defendants, 196 *N.J.* 87, 951 *A.*2d 1040 (2008), and we granted leave to the Attorney General to appear as an amicus curiae.[6]

---

[6] We granted the motion filed on behalf of plaintiffs that sought leave to file a cross-petition for certification out of time, but denied the cross-petition after

For the reasons that follow, we (1) reverse the judgment of the Appellate Division to the extent it reinstated plaintiff's breach of contract and employment claims; (2) reverse the judgment of the Appellate Division to the extent it reinstated plaintiff's federal claims against the school defendants; (3) affirm the judgment of the Appellate Division to the effect that plaintiff's state law defamation and intentional infliction of emotional distress claims for compensatory and punitive damages and per quod claims should be allowed to proceed and are not barred by the Tort Claims Act's immunity provisions; (4) affirm the judgment of the Appellate Division reinstating plaintiff's state law tort claim for invasion of privacy, in part, and as against defendant Ashworth but reverse that judgment to the extent that it reinstated the claim as against defendant Bruno; (5) reverse the judgment of the Appellate Division that allowed plaintiff's false imprisonment and assault and battery claims to proceed; and (6) reverse the judgment of the Appellate Division rejecting the assertion of the medical defendants of the statutory immunity under Title 30.

## III.

We begin our analysis with the constellation of counts in the complaint that, broadly speaking, can be said to fall within the ambit of employment claims. We include plaintiff's claims for breach of contract, violation of due process, sexual harassment, workplace retaliation, and wrongful or constructive[7] discharge in this category.

---

consideration of its merits. 196 *N.J.* 598, 960 *A.2d* 393 (2008). Notwithstanding that decision, to the extent that the arguments raised by defendants require an analysis of the propriety of certain aspects of the decision of the Appellate Division that were adverse to plaintiff, we include those matters in our discussion.

[7] Although not raised in the petition for certification, we agree that plaintiff's claim for common law wrongful discharge cannot be sustained. *See Pierce, supra,* 84 *N.J.* at 72, 417 *A.2d* 505. As we have recently explained, a *Pierce* claim requires a plaintiff to identify a "clear mandate of public policy" about which the

■ As we have previously held, public entities may be found liable for discrimination claims brought by their employees notwithstanding the limitations imposed by the TCA. *See, e.g., Abbamont v. Piscataway Twp. Bd. of Educ.*, 138 *N.J.* 405, 428, 650 *A.*2d 958 (1994) (reaching claims arising pursuant to CEPA as being beyond TCA protections and immunities); *Fuchilla v. Layman*, 109 *N.J.* 319, 337–38, 537 *A.*2d 652 (holding claims based on asserted violation of the LAD fall outside TCA), *cert. denied,* 488 *U.S.* 826, 109 *S.Ct.* 75, 102 *L.Ed.*2d 51 (1988). Therefore, any analysis of the claims raised by plaintiff that relate to her employment must be analyzed in accordance with our usual rules governing such claims and without any overlay of TCA immunities.

First, there can be no doubt on the record before this Court that plaintiff's claims for sexual harassment or workplace discrimination fail. As to the Board, which was plaintiff's employer, those claims fail because she made no complaints. *See Carmona v. Resorts Int'l Hotel, Inc.*, 189 *N.J.* 354, 373, 915 *A.*2d 518 (2007). As against Bruno and Ashworth, they have no individual liability absent proof that they engaged in an act of aiding or abetting. *See Cicchetti v. Morris County Sheriff's Office*, 194 *N.J.* 563, 594, 947 *A.*2d 626 (2008) (explaining statutory bases for individual liability arising from *N.J.S.A.* 10:5–12(e)); *N.J.S.A.* 10:5–12(e) (linking individual liability of "any person" to acts of aiding and abetting). Plaintiff's failure to assert facts supporting an aiding and abetting theory is fatal to her cause of action. *Tarr v. Ciasulli*, 181 *N.J.* 70, 83–84, 853 *A.*2d 921 (2004) (explaining "aiding and abetting" liability to require performance of wrongful act, awareness of illegality, and knowing and substantial assistance to principal violator).

Second, plaintiff's other employment claims also fail because of the unique statutory framework within which such claims, as they

---

employee complained and that was the cause of the employee's discharge from employment. *See Tartaglia v. UBS PaineWebber, Inc.*, 197 *N.J.* 81, 102, 961 *A.*2d 1167 (2008) (explaining history and requirements of *Pierce*-based claim). As plaintiff has not done so, her *Pierce* claim was properly dismissed.

relate to teachers, must be analyzed. *See N.J.S.A.* 18A:1–1 to 18A:76–4.

In summary, the panel held that because the Contractual Liability Act, *N.J.S.A.* 59:13–1 to –10, governs contractual liability of public entities, it applies to the school defendants. *Leang, supra,* 399 *N.J.Super.* at 371, 944 *A.2d* 675. Reasoning that the statute only makes the parties to the contract liable, the court concluded that it only created an avenue for relief against the Board and affirmed the dismissal of the breach of contract claims as against Bruno and Ashworth, because they were not parties to plaintiff's contract. *Ibid.* Although finding that the statute applied, the court reasoned that plaintiff had no reasonable expectation of re-employment, thus barring relief on that claim. Instead, the panel concluded that an implied-in-fact contract analysis could be used to sustain relief. *Ibid.*

We reverse the judgment of the Appellate Division to the extent that it reinstated plaintiff's breach of contract claim as against the Board. We do so both because the Contractual Liability Act itself does not apply to those claims [8] and because the relevant statutory provisions offer plaintiff no basis for relief.

The Contractual Liability Act, which governs contracts of the State, by definition excludes "any such entity which is statutorily authorized to sue and be sued." *N.J.S.A.* 59:13–2. It therefore does not apply to the Board of Education, which, by statute, qualifies as just such an entity. *See N.J.S.A.* 18A:11–2(a) (authorizing boards of education to sue and to be sued). Contrary to the Appellate Division's conclusion, the Contractual Liability Act has no application to plaintiff's claims.

■ Even so, considered in the appropriate statutory context as set forth in Title 18A, none of plaintiff's employment-based claims can survive as against any of the school defendants. As a non-

---

[8] Although the basis for the panel's decision as to Bruno and Ashworth is also flawed, it is not challenged.

tenured public school teacher, plaintiff was employed pursuant to a one-year contract, *see N.J.S.A.* 18A:27–3, which the Board had no obligation to renew, *N.J.S.A.* 18A:27–4.1. When the Board elected not to rehire her for the next school year, it was required to, and it did, notify her in writing of that fact by May 15 of the school year. *N.J.S.A.* 18A:27–10. In light of the Board's clear statutory right to decline to renew her contract, plaintiff's breach of contract claim must fail because that claim is based on the Board's non-renewal decision.

Nor is there any basis on which to conclude, as did the appellate panel, that plaintiff can sustain a breach of contract or quasi-contract claim grounded on an assertion that she was deprived of supplies or a mentor and therefore suffered economic damages. She was paid for her work for the entire school year and had no right to renewal of her contract. At most, her claim that she was not assigned a mentor would relate to her discrimination claim or her non-renewal claim, but neither of those claims survives the statutory analysis.

■ Similarly, we conclude that the appellate panel erred in addressing plaintiff's due process argument as it bears on her employment claims. As with her breach of contract claim, her due process claim must be analyzed in light of the applicable statutory protections afforded to her. Upon plaintiff's receipt of the notification from the Board that her contract would not be renewed, she had a statutory right to request and to receive a written statement of reasons for the Board's decision not to renew her contract. *N.J.S.A.* 18A:27–3.2. In addition, she had a statutory right to demand an "informal appearance" before the Board during which she would be permitted "to convince the members of the board to offer reemployment." *N.J.S.A.* 18A:27–4.1.

Those statutory rights are the embodiment of the process created by the Legislature through which plaintiff could seek to challenge and to be heard about the Board's non-renewal decision. Plaintiff did not avail herself of those statutory rights and therefore failed to take advantage of the avenues of relief that would

have afforded her the due process she now complains was denied to her. We will not permit her to expand upon her statutorily-protected right to be heard by authorizing her to pursue a claim that she was in some way deprived of due process in the Board's non-renewal decision.

Because the Appellate Division did not analyze the breach of employment claims in accordance with the applicable statutory and decisional framework, and because those claims, when considered in accordance with those principles, are barred, we reverse the judgment to the extent that it reinstated plaintiff's breach of contract and employment claims.

## IV.

We turn next to plaintiff's federal claims, some of which the Appellate Division reinstated through its Fourteenth Amendment analysis, but which, we conclude, do not survive scrutiny. Her original complaint, which was directed solely to the school defendants, did not include any counts that can be understood to allege either a federal constitutional or statutory cause of action. Even as the case progressed through discovery and proceeded on appeal, the essential allegations remained insufficient to support any form of federal relief. The lynchpin of the appellate panel's reasoning was its focus on the due process guarantee found in the Fourteenth Amendment. That approach was based on plaintiff's argument on appeal [9] in which she asserted that her complaint included a claim that was based on an alleged deprivation of substantive and procedural due process rights and that was explicitly tethered to the Fourteenth Amendment.[10] *Leang, supra,* 399

---

[9] Although plaintiff also raised a First Amendment argument on appeal to which the panel referred, *see Leang, supra,* 399 *N.J.Super.* at 358, 944 *A.2d* 675, there is no factual basis for such a claim, that theory was never included in plaintiff's pleadings, and the panel's rejection of that argument is not before us.

[10] Plaintiff urges this Court to consider her federal claims as having an alternate basis in the Fourth Amendment. That is, she argues that the false

*N.J.Super.* at 358, 944 *A.*2d 675. Relying on that theory, the appellate panel permitted plaintiff's federal claims to proceed.

Our analysis of the federal claims compels us to reverse the judgment of the appellate panel for several reasons. First, plaintiff's only asserted constitutional claim was the one she described in her complaint, specifying it to be a deprivation of her property right in her employment. Her claim was directed only to her argument that she was not afforded an opportunity to be heard when her contract was not renewed; it had nothing to do with her assertion, first raised on appeal, that she was deprived of liberty when taken to the nurse's office or transported to the hospital.

Second, even if we, like the appellate panel, elected to treat her complaint as if it included such a claim, we do not concur in the panel's analysis of federal qualified immunity. *See Saucier, supra,* 533 *U.S.* at 202, 121 *S.Ct.* at 2156, 150 *L.Ed.*2d at 282. In light of the plain precedents holding that entitlement to federal qualified immunity is both a matter of law, *see Wildoner v. Borough of Ramsey,* 162 *N.J.* 375, 387, 744 *A.*2d 1146 (2000) (quoting *Mitchell v. Forsyth,* 472 *U.S.* 511, 526, 105 *S.Ct.* 2806, 2815, 86 *L.Ed.*2d 411, 425 (1985)), and that good faith conduct falls within the scope of that entitlement, *Anderson v. Creighton,* 483 *U.S.* 635, 663, 107 *S.Ct.* 3034, 3052, 97 *L.Ed.*2d 523, 546 (1987); *Harlow v. Fitzgerald,* 457 *U.S.* 800, 815, 102 *S.Ct.* 2727, 2736, 73 *L.Ed.*2d 396, 408 (1982); *Kirk v. City of Newark,* 109 *N.J.* 173, 179–85, 536 *A.*2d 229 (1988), we see no ground on which to permit a federal claim to proceed.

In part, we reach our conclusion about federal qualified immunity because of our evaluation of the context in which these events occurred, a school setting that we have repeatedly regarded as calling for protections geared toward the safety of students. *See*

---

arrest and false imprisonment claims included in her original complaint were "seizure" allegations that might have supported a Fourth Amendment analysis and, by extension, a federal statutory remedy. *See* 42 *U.S.C.* § 1983. We decline to permit plaintiff to raise a theory that she has not pleaded and, at the appellate level, conceded was not available to her.

*Jerkins v. Anderson,* 191 *N.J.* 285, 289, 922 *A.*2d 1279 (2007) (holding that "a school's duty to exercise reasonable care for the children in its custody is integral" to New Jersey's public education system); *L.W. v. Toms River Reg'l Sch. Bd. of Educ.,* 189 *N.J.* 381, 406, 915 *A.*2d 535 (2007) (recognizing cause of action for student-on-student harassment based on perceived sexual orientation because a "contrary conclusion would be at loggerheads with the State's strong policy of protecting students"); *Frugis v. Bracigliano,* 177 *N.J.* 250, 268, 827 *A.*2d 1040 (2003) (reasoning that educators have "[n]o greater obligation ... than to protect the children in their charge from foreseeable dangers"); *Joye v. Hunterdon Cent. Reg'l High Sch. Bd. of Educ.,* 176 *N.J.* 568, 573–74, 826 *A.*2d 624 (2003) (finding that "school officials are responsible for the children entrusted to their care").

More to the point, in light of the fact that the school was a signatory to the Agreement, and in light of the obligations of the individual defendants to act so as to protect the safety of the students, we see no basis on which to conclude that, whatever rights plaintiff may have had, "it would be clear to a reasonable [person] that [the individual defendants'] conduct was unlawful in the situation ... confronted." *Saucier, supra,* 533 *U.S.* at 202, 121 *S.Ct.* at 2156, 150 *L.Ed.*2d at 282. In these circumstances, we decline to permit plaintiff's unsupported assertion that Ashworth and Bruno were acting in bad faith so as to deprive them of the qualified immunity that so plainly obtains.

Third, we reverse the judgment of the appellate panel to the extent that it concluded that Ashworth's mere presence in the nurse's office independently would suffice to support a cause of action against him pursuant to § 1983. The terse holding to that effect gives no clue as to its theoretical basis, and we discern none in the applicable case law, which requires that, in order to be liable, the actor must engage in conduct that violated plaintiff's constitutional right. *Ibid.,* 121 *S.Ct.* at 2156, 150 *L.Ed.*2d at 282.

We therefore reverse the judgment of the Appellate Division to the extent that it reinstated plaintiff's federal claims against any of the school defendants.

## V.

We next consider the several state law tort claims raised as against the school defendants, together with the assertions of those defendants that their acts are entitled to the cloak of qualified immunity afforded by the TCA.

We begin with a brief overview of the TCA and the qualified immunity it confers. Public officials are cloaked with immunity from, or with limitations upon, tort claims under certain circumstances designated in the TCA, *N.J.S.A.* 59:1–1 to 59:12–3, several sections of which are particularly relevant to our consideration of the issues raised in this appeal.

First, the public employee has the burden to plead and prove his immunity under the TCA. *Kolitch v. Lindedahl,* 100 *N.J.* 485, 497, 497 *A.*2d 183 (1985). "[T]o succeed on a motion for summary judgment, the [public employee] must come forward with proof of a nature and character [that] would exclude any genuine dispute of fact" as to the application of immunity. *Ibid.* (citations omitted). Once the public employee has met that burden, "summary judgment is warranted and, indeed, desirable, as a matter of judicial economy." *Ibid.*

The TCA sets forth the test for immunity, providing it to a public employee who "acts in good faith in the execution or enforcement of any law." *N.J.S.A.* 59:3–3. We have held that in order for that immunity to apply, the public employee must "establish that [his or her] acts were objectively reasonable or that [he or she] performed them with subjective good faith." *Canico v. Hurtado,* 144 *N.J.* 361, 365, 676 *A.*2d 1083 (1996). Therefore, an employee may be immune from liability under either an objective or a subjective analysis. Even so, the grant of immunity is not unlimited. By its terms that immunity provision is not all-encompassing, for it excludes both claims based on false arrest and false imprisonment entirely. *Ibid.* Moreover, the TCA specifically provides that there will be no immunity for a public employee if the conduct complained of constituted actual fraud, actual malice, or willful misconduct. *N.J.S.A.* 59:3–14(a) ("Noth-

ing in this act shall exonerate a public employee from liability if it is established that his conduct was outside the scope of his employment or constituted ... actual fraud, actual malice or willful misconduct.").

In addition to the grant of immunity, the TCA includes a "verbal threshold," N.J.S.A. 59:9–2(d), which serves to limit claims seeking to recover damages for pain and suffering. It provides that such damages are only available "in cases of permanent loss of a bodily function, permanent disfigurement or dismemberment where the medical treatment expenses are in excess of $3,600.00." Ibid.

It is only through a careful balancing of those separate provisions, some of which operate in favor of plaintiffs seeking to recover and others of which have the opposite intent and effect, that we can understand and evaluate the claims raised in this appeal. We turn, then, to our analysis of the state law tort claims raised by plaintiff which are before us on appeal. More particularly, we address plaintiff's claims for defamation, intentional infliction of emotional distress, invasion of privacy, assault and battery, and false imprisonment, all of which the Appellate Division reinstated as against Bruno and Ashworth individually on the ground that they were not entitled to TCA immunity against those claims.[11]

## A.

We begin our analysis with an examination of the TCA provisions that strip away immunity for acts of willful misconduct. As

---

[11] The Appellate Division reasoned that the grant of summary judgment to the Board was also in error, see Leang, supra, 399 N.J.Super. at 367, 944 A.2d 675, but concluded the "error ... is harmless" based on its alternate analysis that the employees were barred from making a respondeat superior claim against the Board for any of these intentional torts because of N.J.S.A. 59:2–10. See Seal Tite Corp. v. Bressi, 312 N.J.Super. 532, 539, 712 A.2d 262 (App.Div.), certif. denied, 156 N.J. 411, 719 A.2d 643 (1998). Because we denied plaintiff's cross-petition, the dismissal of the state law causes of action against the Board is not before us.

we have held, "[b]y its plain, unambiguous, and specific terms, *N.J.S.A.* 59:3–14(a) [the actual fraud, actual malice or willful misconduct provision] creates an exception to the verbal threshold," *Toto v. Ensuar,* 196 *N.J.* 134, 145, 952 *A.*2d 463 (2008); *see also Velez v. City of Jersey City,* 180 *N.J.* 284, 291, 850 *A.*2d 1238 (2004) (explaining that "[i]t is the intent of [*N.J.S.A.* 59:3–14(a)] that a public employee guilty of outrageous conduct cannot avail himself of the limitations as to liability and damages contained in [the TCA]" (citation omitted)).

■■ The traditional formulation of willful misconduct has required "a showing that there has been a deliberate act or omission with knowledge of a high degree of probability of harm and reckless indifference to consequences." *Berg v. Reaction Motors Div., Thiokol Chem. Corp.,* 37 *N.J.* 396, 414, 181 *A.*2d 487 (1962). In some contexts, we have described it as conduct that falls "between simple negligence and the intentional infliction of harm," *Fielder v. Stonack,* 141 *N.J.* 101, 123, 661 *A.*2d 231 (1995) (citation omitted), cautioning that "there must be some knowledge that the act is wrongful," *id.* at 124, 661 *A.*2d 231.

Viewed together, these articulations of the concept demand an evaluation of the evidence adduced rather than a focus on the label given to the cause of action. Because the appellate panel looked generally at the intentional torts, our review must include a separate analysis of each of these torts, and the factual assertions supporting each, to determine which of them, in light of this standard, will withstand scrutiny when tested against the willfulness standard.

## B.

We begin with plaintiff's claims for defamation and for intentional infliction of emotional distress, both of which illustrate the operation of the statutory immunities that we have explained. The Appellate Division reinstated the defamation claim based on its comparison of the elements included in such a claim against the immunity defense. In short, the panel concluded that because

defamation includes the element of "actual malice," *see New York Times Co. v. Sullivan*, 376 *U.S.* 254, 279–80, 84 *S.Ct.* 710, 726, 11 *L.Ed.*2d 686, 706 (1964), by definition a public employee could not claim immunity protection, *see Jobes v. Evangelista*, 369 *N.J.Super.* 384, 395, 849 *A.*2d 186 (App.Div.), *certif. denied*, 180 *N.J.* 457, 852 *A.*2d 193 (2004).

Defendants argue that the panel erred both in failing to recognize that plaintiff offered no factual evidence sufficient to support her defamation claim and in refusing to extend to them the statutory immunity protection. We consider those arguments in turn. We have identified the elements of the cause of action for defamation to be: "(1) the assertion of a false and defamatory statement concerning another; (2) the unprivileged publication of that statement to a third party; and (3) fault amounting at least to negligence by the publisher." *DeAngelis v. Hill*, 180 *N.J.* 1, 13, 847 *A.*2d 1261 (2004). To determine if a statement has a defamatory meaning, a court must consider three factors: "(1) the content, (2) the verifiability, and (3) the context of the challenged statement." *Id.* at 14, 847 *A.*2d 1261.

In order to evaluate a statement's content, a court must consider "the fair and natural meaning that will be given to the statement by reasonable persons of ordinary intelligence." *Ibid.* (citations omitted). When considering verifiability, a court must "determine whether the statement is one of fact or opinion." *Ibid.* While a statement of opinion generally enjoys absolute immunity, a statement of fact is actionable "[o]nly if the statement suggested specific factual assertions that could be proven true or false." *Ibid.* Finally, to decide whether a statement is capable of a defamatory meaning, a court must consider "the listener's reasonable interpretation, which will be based in part on the context in which the statement appears." *Id.* at 15, 847 *A.*2d 1261 (citations omitted). In general, "words that subject a person to ridicule or contempt, or that clearly sound to the disreputation of an individual are defamatory on their face." *Id.* at 13–14, 847 *A.*2d 1261 (citations omitted).

◼ Although the record is far from clear, we agree with the Appellate Division that, viewed in a light most favorable to plaintiff, her factual allegations suffice. Plaintiff alleged in her complaint that the school defendants made a false accusation against her in "an open and notorious manner" and that the accusation destroyed her good name, "as it was publicly indicated that she was mentally unbalanced and was an imminent [danger] to the safety of herself and/or others." Although, in the end, plaintiff will be left to her proofs, a reasonable person could consider the school defendants' accusation that she had threatened to kill twenty-two students, if it is not true, to be defamatory. We turn, then, to consider whether the school defendants are immune.

In analyzing the defamation claim, the Appellate Division focused on whether the defendants can claim the protection of immunity, regardless of what they said. In doing so, the panel utilized the "actual malice" standard, reasoning that it would be inconsistent with a grant of immunity against plaintiff's defamation claim. *See Jobes, supra,* 369 *N.J.Super.* at 395, 849 *A.*2d 186 (finding that good faith required for qualified immunity under TCA and actual malice required for defamation claim are mutually exclusive). A comparison of the elements that plaintiff will be required to prove in order to succeed on the claim demonstrates that defendants are not entitled to immunity under the TCA.

◼ In a similar context, we have recognized that speech relating to teachers in their role as educators implicates a matter of public concern, thus calling for the highest level of protection. *See Rocci v. Ecole Secondaire MacDonald–Cartier,* 165 *N.J.* 149, 156–57, 755 *A.*2d 583 (2000) ("we must ensure that our jurisprudence does not act to chill complaints about a teacher's behavior in the presence of students or similar matters involving the public interest."). Therefore, we agree with the appellate panel that the "actual malice" standard applies and, if plaintiff can meet it, that proof would make the immunity protection inapplicable. In like fashion, plaintiff's factual assertions, if they meet the actual malice standard, would also suffice to prove willfulness, thus relieving

plaintiff of the otherwise applicable verbal threshold. *N.J.S.A.* 59:3–14(a). Utilizing that analytical construct, we agree with the judgment of the Appellate Division reinstating plaintiff's defamation claim.

██ By the same reasoning, we also agree with the Appellate Division's reinstatement of plaintiff's claim for punitive damages associated with her defamation claim. Because a punitive damages award also requires either actual malice or willful disregard of a likelihood of harm, *N.J.S.A.* 2A:15–5.12, plaintiff's assertions, if proven, could suffice to support such an award. Similarly, although the record is insufficient to evaluate with precision whether plaintiff's spouse will be able to succeed on his per quod claim, by applying the same analysis, it too was appropriately reinstated. *See Murphy v. Implicito,* 392 *N.J.Super.* 245, 269–70, 920 *A.*2d 678 (App.Div.2007).

██ We reach a similar result in our evaluation of plaintiff's intentional infliction of emotional distress claim. We have held that, in order to prevail on that common law claim, "the plaintiff must establish intentional and outrageous conduct by the defendant, proximate cause, and distress that is severe." *Tarr, supra,* 181 *N.J.* at 77, 853 *A.*2d 921 (quoting *Buckley v. Trenton Saving Fund Soc'y,* 111 *N.J.* 355, 366, 544 *A.*2d 857 (1988)). In general, that requires proof that "the emotional distress ... be so severe that no reasonable person could be expected to endure it." *Ibid.* (citations omitted). Finally, "[b]ecause the severity of the emotional distress raises questions both of law and fact, the court decides whether as a matter of law such emotional distress can be found, and the jury decides whether it has in fact been proved." *Ibid.* (citation omitted).

Plaintiff's emotional distress claim rests on several factual assertions. She contends that Ashworth, seeking revenge against her, intentionally "put words in her mouth" and inaccurately reported what she had said. Plaintiff asserts that Bruno knew that she is a practicing Buddhist and a non-violent person who would not have made such a threat. She argues that both of those

defendants knew of her past suffering in Cambodia and her fear of governmental authorities and that they intentionally arranged for her to be taken away in a "public and notorious" way with the intention of preventing her from pursuing future employment as a teacher.

As with our evaluation of plaintiff's defamation claim, those assertions, if they can be proven at trial, could support a recovery. Likewise, the elements of the cause of action place the claim outside of the scope of the qualified immunity and the verbal threshold protection otherwise available to defendants. Although not entirely overlapping with our evaluation of the defamation claim, we agree with the Appellate Division's assessment to the extent that those facts, if proven, would bespeak a willfulness permitting relief. Moreover, by an analysis similar to that employed for plaintiff's defamation claim, the punitive damages and per quod claims associated with her intentional infliction of emotional distress claim also were properly reinstated. *See N.J.S.A.* 2A:15–5.12; *Murphy, supra,* 392 *N.J.Super.* at 269–70, 920 *A.*2d 678.

## C.

We affirm in part and reverse in part the reinstatement of plaintiff's claim for invasion of privacy. Although she did not specify which privacy cause of action she was asserting, the common law right to privacy recognizes essentially two. *See Hennessey v. Coastal Eagle Point Oil Co.,* 129 *N.J.* 81, 94, 609 *A.*2d 11 (1992). The first, known as the tort of intrusion on seclusion, imposes liability on "[o]ne who intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns … if the intrusion would be highly offensive to a reasonable person." *Id.* at 94–95, 609 *A.*2d 11 (quoting *Restatement (Second) of Torts,* § 652B (1977)). The second, known as the tort of false light, involves "publicity that unreasonably places the other in a false light before the public." *Romaine v. Kallinger,* 109 *N.J.* 282, 293, 537 *A.*2d 284 (1988)

(citations omitted). The tort of false light has two elements: (1) "the false light in which the other was placed would be highly offensive to a reasonable person"; and (2) "the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed." *Id.* at 294, 537 A.2d 284 (quoting *Restatement (Second) of Torts,* § 652E).

 Plaintiff's invasion of privacy claim is based on two specific events, which she has referred to as the "strip search," by which she means the physical examination conducted by the hospital doctors, and the psychiatric evaluation she underwent. The claim therefore must be analyzed within the parameters of the tort of intrusion on seclusion. In addition, our evaluation of this claim is complicated because the critical events about which plaintiff complains are, in large part, separated from the acts of these defendants. Moreover, our evaluation must remain faithful to the immunity and verbal threshold provisions of the TCA, either of which could prevent plaintiff from succeeding.

Nevertheless, we approach these claims, as we do the others, in the context of a summary judgment motion, and we evaluate them with that in mind. In order to recover on either version of this tort, plaintiff must first demonstrate that the physical and psychiatric examination at the hospital was "highly offensive to a reasonable person." However, because both of these examinations took place at the hospital and at the direction of hospital personnel, plaintiff can only recover if she can prove a causal link between them and defendants' actions and if her proofs suffice to meet the TCA. That is, she must prove that defendants' actions were such that they fall outside of the protection of immunity and, to the extent that she falls short of the verbal threshold's requirements, she can only recover if she can prove that defendants' actions were both wrongful and willful.

 Generously read, plaintiff's invasion of privacy claim rests *on* her assertion that Ashworth, seeking revenge, intentionally and falsely reported that plaintiff had uttered a threat, with the

malicious intent that she would be taken to the hospital and subjected to examinations that would be highly offensive to an ordinary person, and that his false report caused those events to occur. As to Bruno, plaintiff's invasion of privacy claim must rest on the assertion that she shared or joined in Ashworth's plan with a malicious intent and knowing that his claim about the threat was false.

Our careful review of the record convinces us that plaintiff simply cannot meet these proof requirements as to Bruno, because there is no evidence that Bruno acted with the requisite intent or that she thought that the report of a threat was false. Although the question is a closer one as to Ashworth, there is evidence that he did not accurately report what plaintiff said and that he would have been aware that under the Agreement, his report would trigger a call to the police or a mental health evaluation. We find in those assertions the bare minimum needed for plaintiff to be able to proceed on her claim against Ashworth for invasion of privacy.

We caution the trial court, however, that because plaintiff has suffered no injury sufficient to meet the verbal threshold, in order to succeed on this claim, plaintiff will be required to demonstrate that Ashworth's report was not simply inaccurate, but that he knew it to be false and willfully reported it as true. Moreover, plaintiff will also be required to prove that the medical and psychiatric examinations were "highly offensive to a reasonable person" and that Ashworth, rather than the police or EMTs, was the proximate cause of those two discrete events on which her invasion of privacy claim is based.

### D.

Next, we consider, and we reject, the assertion that plaintiff can proceed to trial on her claim of false imprisonment. Although the claim, on its face, is excluded from the statutory immunities, that does not equate with a conclusion that plaintiff

should be permitted to proceed. On the contrary, the record here demonstrates that she cannot prevail on that claim.

 False imprisonment is "the constraint of the person without legal justification." *Mesgleski v. Oraboni*, 330 *N.J.Super.* 10, 24, 748 *A.*2d 1130 (App.Div.2000). The tort of false imprisonment has two elements: (1) "an arrest or detention of the person against his or her will" and (2) "lack of proper legal authority or legal justification." *Ibid.* (citation omitted).

Plaintiff testified that she did not try to leave the nurse's office because the nurse told her that Bruno would consider rehiring her for the following year if she waited there until Bruno arrived. In other words, plaintiff, by her own admission, was not constrained unlawfully in the nurse's office by the school defendants. Instead, she voluntarily went to the office, and she chose to remain there in order to better her chances of being rehired. More to the point, the record reflects that she napped in the nurse's office while awaiting Bruno's return from the graduation ceremony, an undisputed fact in sharp contrast with any suggestion that she was held there against her will. There being no evidence in the record to support that critical element of the proofs required to sustain a cause of action for false imprisonment, it was appropriately dismissed, and we reverse the appellate panel's contrary judgment.

E.

 For separate reasons, we find no basis on which to permit plaintiff's claims for assault and battery to proceed. A person is subject to liability for the common law tort of assault if: "(a) he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and (b) the other is thereby put in such imminent apprehension." *Wigginton v. Servidio*, 324 *N.J.Super.* 114, 129, 734 *A.*2d 798 (App.Div.1999) (quoting *Restatement (Second) of Torts* § 21 (1965)). The tort of battery rests upon a nonconsensual touching. *Perna v. Pirozzi*, 92 *N.J.* 446, 461, 457 *A.*2d 431 (1983).

 Tested against this standard, there are two insurmountable impediments to plaintiff's ability to proceed with her claims for assault and battery. First, there is no evidentiary support for plaintiff's assertion of "bleeding" and "seventy-two bruises" as the factual basis for those claims. Those injuries appear nowhere in the medical records and plaintiff, in response to the motion for summary judgment, failed to produce any evidence, including the photographs she asserts would prove the truth of those assertions. Second, it is noteworthy that all of plaintiff's factual assertions about assault and battery are directed to an alleged beating by the police, rather than acts by the school defendants. Consequently, we find no basis on which she can proceed with these claims as against the school defendants.

## VI.

We granted the petition of the medical defendants to consider their arguments that the Appellate Division erred in its rejection of their assertions that they were entitled to immunity. Pointing to two separate statutory constructs, namely the Good Samaritan Act, *N.J.S.A.* 2A:62A–1, and Title 30, *N.J.S.A.* 30:4–27.7, they argued that the Appellate Division erred in concluding that they were not within either of those statutory grants of immunity. Although we agree with the appellate panel's conclusion that the Good Samaritan Act does not apply to these defendants, we conclude that the panel erred in rejecting the alternate statutory basis for immunity, and we therefore reverse the panel's judgment reinstating plaintiff's claims against the medical defendants.

Our analysis of the Good Samaritan Act, and its application to the facts of this appeal, need not be lengthy. The Act essentially provides that certain licensed practitioners of healing arts and emergency or first aid volunteers "who in good faith render[ ] emergency care at the scene of an accident or emergency ... or while transporting" the victim for care, "shall not be liable for any civil damages as a result of [their] acts or omissions." *N.J.S.A.* 2A:62A–1. The statute does not define accident or emergency,

but the statement that accompanied the bill that became the Good Samaritan Act makes it plain that the statute's intent was to apply to events such as roadside accidents and like emergencies. That statement commented: "The purpose of this bill is to encourage the rendering of aid to injured persons at the scene of an accident or emergency without fear of civil liability." *Statement accompanying Assembly Bill No. 62, L.* 1963, *c.* 140 (1963).

We have relied on that understanding of the Act, concluding that it refers to "physicians [or other covered individuals] who come upon such patients by chance," and therefore does not apply to treatment rendered by such professionals in other settings. *See Velazquez v. Jiminez,* 172 *N.J.* 240, 259, 798 *A.2d* 51 (2002) (holding that Good Samaritan immunity does not extend to emergencies in hospitals because "the fundamental problem facing a Good Samaritan on the street (the ability to do little more than render first aid under less than optimal circumstances) is not present").

Plaintiff was not the victim of an accident or an emergency of the kind envisioned by the Legislature when it enacted the Good Samaritan Act; the medical defendants did not come upon plaintiff "by chance" but instead came upon her when responding to a call for their assistance. Were we to read the statute's language as they do, we would be granting to emergency responders a far broader immunity than the Legislature included in the statute, because it would inevitably apply to any and all calls for their assistance. More to the point, even if that might be an appropriate reading to apply to emergency responders, who, at least in theory, are always coming to the scene of an emergency, it would greatly expand the reach of the Act as it relates to every other covered individual, including the practitioners of all of the healing arts. That being the case, we decline their invitation to give a broader reading to the statute than did the drafters.

We reach a contrary conclusion, however, with respect to Title 30, the other statutory basis on which the medical defendants relied for their assertion of immunity. The section of Title 30 that

defendants assert applies relates to the care and treatment of persons who are mentally ill, and, in particular, governs involuntary civil commitment of such individuals. *See N.J.S.A.* 30:4–27.1 to –31. Included within that regulatory scheme are provisions relating to evaluation and screening of persons who are believed to be in need of involuntary civil commitment, one part of which is focused on those law enforcement and related persons who may be involved in that process. The immunity provision in issue is found within that larger statutory scheme.

In pertinent part, the statute confers immunity on certain designated individuals, including law enforcement personnel, who "take[ ] reasonable steps to assess, take custody of, detain or transport" someone who is in need of the mental health assessment warranted by the statute. *N.J.S.A.* 30:4–27.7(a). One section of that statutory grant of immunity, however, specifically extends to emergency services personnel and persons involved in medical transport, *N.J.S.A.* 30:4–27.7(b), which includes a member of a first aid, ambulance, rescue squad or fire department, whether paid or volunteer, auxiliary police officer or paramedic. The statutory grant of immunity provides as follows:

> b. An emergency services or medical transport person or their respective employers, acting in good faith pursuant to this act and pursuant to the direction of a person designated in subsection a. of this section, who takes reasonable steps to take custody of, detain or transport an individual for the purpose of mental health assessment or treatment is immune from civil and criminal liability.
>
> [*N.J.S.A.* 30:4–27.7(b).]

In order to claim the protections of that immunity, therefore, an individual who falls within the definition of an emergency services or medical transport person must act in good faith pursuant to the statute and at the direction of one of the designated individuals, including a law enforcement officer.

In concluding that there was a genuine issue of material fact about whether the medical defendants were entitled to immunity, the appellate panel recognized that the key was whether the EMTs acted at the direction of a law enforcement officer. In addressing that question, however, the panel imported its analysis

of the earlier statutory section that fixes the standards for involuntary commitment and the authority it vests in law enforcement personnel, *see N.J.S.A.* 30:4–27.6(a), and, finding it wanting, the panel extended that failure of proofs to the EMTs.

In doing so, however, the panel overlooked the fact that plaintiff's essential factual claim was not whether the EMTs acted pursuant to the direction of law enforcement personnel; rather, her claim was that the EMTs only transported her because the police had already arrested her for the purpose of being taken for a psychiatric evaluation. Seen in that light, the evidence on which the Appellate Division relied might have been relevant if the question were about immunity for an involuntary commitment. *See Ziemba v. Riverview Med. Ctr.,* 275 *N.J.Super.* 293, 301–03, 645 *A.*2d 1276 (App.Div.1994) (granting summary judgment in favor of defendants under *N.J.S.A.* 30:4–27.7 for plaintiff's failure to provide expert testimony). That evidence, however, is insufficient to cast any doubt on the fact that the EMTs performed their transport as directed by the police.

Based on the undisputed factual record, there can be no question that the medical defendants are entitled to the protection of this statutory immunity. They were summoned through a 911 call alerting them to an individual who was described to them to be emotionally disturbed, and they arrived on the scene of a volatile situation at an elementary school where they found plaintiff, who was frantic and agitated. When they arrived, law enforcement personnel were in command on the scene and an officer accompanied them in their rescue vehicle when they transported plaintiff to a hospital where an evaluation could be conducted. Particularly when viewed in light of plaintiff's essential assertions about the involvement of law enforcement personnel, we find no genuine issue of material fact about whether the EMTs acted with the authority and under the direction that the statutory immunity contemplates.

Our conclusion that the medical defendants are entitled to a grant of summary judgment also supports the conclusion that

there is no basis on which to permit plaintiff to proceed against them for punitive damages. ˙We therefore reverse that aspect of the Appellate Division's judgment and direct that judgment in favor of the medical defendants be entered.

## VII.

The judgment of the Appellate Division is reversed to the extent that it reinstated plaintiff's federal causes of action and employment claims and to the extent that it reinstated plaintiff's state tort claims for assault and battery, and false imprisonment as against the school defendants. The judgment of the Appellate Division is reversed to the extent that it reinstated the tort claim for invasion of privacy as against defendant Bruno, only. The judgment of the Appellate Division is reversed to the extent that it reinstated plaintiff's claims against the medical defendants. In all other respects, the judgment of the Appellate Division is affirmed.

*For affirmance in part; reversal in part* Chief Justice RABNER and Justices LONG, LaVECCHIA, WALLACE RIVERA–SOTO and HOENS—6.

*Opposed*—None.