275 N.J. Super. 293 (1994)
645 A.2d 1276
DOUGLAS ZIEMBA, PLAINTIFF-RESPONDENT,
v.
RIVERVIEW MEDICAL CENTER, AUGUSTINE TAMBINI, DENNIS WONG, M.D. AND PATRICIA WEBB, R.N., DEFENDANTS-APPELLANTS, AND CENTRASTATE MEDICAL CENTER, SARA S. THOMAS, M.D., DR. FELDMAN, RAMAPO RIDGE PSYCHIATRIC HOSPITAL, JOSEPH TRAVERSO, M.D., PETER WAGAR, MATTHEW BEYER, ALBA WAGAR, ANDREW T. GOODWIN, PATROLMAN LITTLEFIELD, PATROLMAN MANLEY AND TOWNSHIP OF COLTS NECK, DEFENDANTS.
Superior Court of New Jersey, Appellate Division.
Submitted May 10, 1994.
Decided August 8, 1994.
*294 Before Judges MICHELS and SKILLMAN.
Donington, Karcher, Salmond, Ronan & Rainone, attorneys for appellants Riverview Medical Center, Augustine Tambini and Patricia Webb, R.N. (MaryAnn Nobile, of counsel and on the brief).
Widman & Cooney, attorneys for appellant Dennis Wong, M.D. (Arthur M. Pavluk, III, of counsel; Joseph K. Cooney and Mr. Pavluk, on the brief).
Allegra & Nebelkopf, attorneys for respondent Douglas Ziemba (Elizabeth Loud-Hayward, of counsel; Peter A. Allegra and Ms. Loud-Hayward, on the brief).
The opinion of the court was delivered by MICHELS, P.J.A.D.
We granted defendants Riverview Medical Center, Augustine Tambini, Patricia Webb, R.N. and Dennis Wong, M.D. leave to appeal from orders of the Law Division that denied their motions *295 for summary judgment in this medical malpractice action. The trial court held that because there were genuine issues of material fact regarding whether defendants acted in good faith and took reasonable steps in connection with the involuntary commitment of plaintiff, defendants were not entitled to immunity under N.J.S.A. 30:4-27.7 as a matter of law. We disagree and reverse.
The facts giving rise to this appeal arose out of a marital dispute between plaintiff and his wife. On the evening of February 7, 1991, apparently in a fit of rage, plaintiff threw pots, pans and other cooking utensils throughout his kitchen. The Colts Neck police were called to plaintiff's residence but no formal action was taken at that time. Shortly thereafter, plaintiff went to the Colts Neck Volunteer Firehouse, where he was a member. He discussed what had happened with his fellow firemen, and two of the firemen accompanied plaintiff back to his house. According to one of the firemen, plaintiff was crying, shaking and extremely upset. Upon arriving at the house, plaintiff was met by Colts Neck police officers who took plaintiff to the Colts Neck Police Headquarters. While at police headquarters, plaintiff was served with a restraining order which prevented him from entering the marital home or contacting his wife.
Although the record is unclear as to the precise chronology of events, it appears that sometime after plaintiff was released by the Colts Neck police, he returned to the firehouse. According to the firemen, plaintiff expressed a desire to commit suicide by jumping off the Thomas Driscoll/Raritan River Bridge. One fireman testified that plaintiff discussed his plan in detail, even mentioning the precise mile marker on the bridge from which he planned to jump. In an attempt to dissuade plaintiff from acting on his plan, several firemen talked to plaintiff. One fireman, defendant Peter Wagar, called his sister, defendant Alba Wagar, a social worker, and asked her to speak with plaintiff over the phone. Plaintiff denied ever expressing a suicide wish.
After speaking with Ms. Wagar, plaintiff left the firehouse. According to plaintiff, he drove toward the home of his mother in *296 East Brunswick. The firemen, however, called the Colts Neck police because they feared that plaintiff was driving toward the bridge from which he had said he would jump. The police stopped plaintiff's vehicle and took plaintiff to the Riverview Medical Center Emergency Room. Plaintiff contends that the police stopped him, searched his car, detained him at gunpoint and then brought him to the Riverview Medical Center after telling him that he was being taken to the Colts Neck Police Headquarters.
In the early hours of February 8, 1991, Dr. Gerald Starkey examined plaintiff in the emergency room of the Riverview Medical Center. Dr. Starkey found no physical problems with plaintiff, but he requested an evaluation of plaintiff by a psychiatric crisis worker. Webb, a certified psychiatric nurse in the Crisis Unit of the Children's Psychiatric Center of the Riverview Medical Center, conducted the initial interview and psychiatric evaluation of plaintiff for the Monmouth County Screening Center. At this time, Tambini was the on-call screener and Dr. Wong was the on-call screening psychiatrist. Webb, therefore, sought the advice of Dr. Wong. Webb explained to Dr. Wong her findings concerning plaintiff, including his refusal to voluntarily engage in psychiatric treatment. Dr. Wong directed Webb to begin the screening process to evaluate plaintiff for possible involuntary psychiatric commitment.
After Webb completed her evaluation of plaintiff, Tambini interviewed plaintiff, questioning him about his history of marital problems, destructive behavior and physical violence in the household, and the recent events of the previous night. Tambini then evaluated plaintiff and completed the Monmouth Medical Center Screening Form, which included a detailed statement of findings and evaluation of plaintiff. In connection with the screening process, Tambini attempted to verify the information he received by trying to contact plaintiff's family. While the record indicates that Tambini called plaintiff's wife, and while plaintiff's wife acknowledges receiving a call, she did not remember who called or *297 what was discussed. Plaintiff, on the other hand, claims that Tambini did not attempt to verify the information in any way.
Following Webb's and Tambini's evaluations, Dr. Wong then evaluated plaintiff. In connection with his evaluation, Dr. Wong did not independently verify the information that Tambini had furnished to him, but he did ask plaintiff if the information was accurate. Although Dr. Wong did not recall plaintiff's response, he testified that plaintiff was uncooperative, and that "there was no denial by plaintiff of the facts and conclusions being presented to him." According to the detailed certification completed by Dr. Wong, plaintiff "admitted to having a gun and voiced threats to kill himself...." Dr. Wong was of the opinion that plaintiff presented a danger to himself and others and should be involuntarily committed. Plaintiff was involuntarily committed to the Riverview Medical Center on February 8, 1991. He then was transferred to The CentraState Medical Center in Freehold, New Jersey and thereafter to the Ramapo Psychiatric Hospital in Wyckoff, New Jersey, where he remained for seven days.
Plaintiff instituted this action against several defendants, including Dr. Wong, Webb, Tambini and Riverview Medical Center. Plaintiff charged these defendants with negligence and medical malpractice in their diagnosis, treatment and supervision of him. Specifically, plaintiff charges that Dr. Wong "did not take reasonable steps as required by the statute to assess [him] and evaluate the information provided by ... Webb and Tambini prior to making the final decision to have [him] involuntarily committed." With respect to Webb and Tambini, plaintiff charged that they "did not take reasonable steps as required by the statute to assess [him] and evaluate the information provided by the Colts Neck Police prior to making the final decision to have [him] involuntarily committed." After issue was joined and discovery completed, defendants moved for summary judgment on the ground that they were immune from liability under N.J.S.A. 30:4-27.7. The trial court denied the motion on the ground that defendants were not entitled to immunity under the statute as a matter of law because *298 genuine issues of material fact existed as to whether defendants acted in good faith and took reasonable steps in committing plaintiff involuntarily for psychiatric treatment. In reaching this conclusion, the trial court relied principally on the written report submitted by plaintiff's medical expert, Dr. Leslie Fine of Cedarhurst, New York. We granted defendants leave to appeal and consolidated the appeals.
We are convinced from our study of the record and the arguments presented that the trial court erred in denying summary judgment to defendants. It is firmly established that a motion for summary judgment will be granted where the pleadings, depositions and certifications do not show the existence of a genuine issue of material fact which would require disposition by a plenary trial. R. 4:46-2. See Ziegelheim v. Apollo, 128 N.J. 250, 261-62, 607 A.2d 1298 (1992); Ruvolo v. American Cas. Co., 39 N.J. 490, 499, 189 A.2d 204 (1963); Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67, 73-75, 110 A.2d 24 (1954); Albright v. Burns, 206 N.J. Super. 625, 631-32, 503 A.2d 386 (App.Div. 1986); Miller v. U.S. Fidel. & Guar. Co., 127 N.J. Super. 37, 40-41, 316 A.2d 51 (App.Div. 1974); Sokolay v. Edlin, 65 N.J. Super. 112, 120, 167 A.2d 211 (App.Div. 1961). Moreover, "[b]are conclusions in the pleadings, without factual support in tendered affidavits, will not defeat a meritorious application for summary judgment." U.S. Pipe and Foundry Co. v. Amer. Arbitration Ass'n., 67 N.J. Super. 384, 399-400, 170 A.2d 505 (App.Div. 1961). Here, the pleadings, depositions, certifications and exhibits submitted in connection with the motions show that no genuine issue of material fact existed and that summary judgment was appropriate for the disposition of this matter.
New Jersey law provides for involuntary civil commitment of individuals who pose a danger to themselves or to others. The policy behind involuntary civil commitment is set forth in N.J.S.A. 30:4-27.1b, which states:
Because involuntary commitment entails certain deprivations of liberty, it is necessary that State law balance the basic value of liberty with the need for safety and treatment, a balance that is difficult to effect because of the limited ability to *299 predict behavior; and, therefore, it is necessary that State law provide clear standards and procedural safeguards that ensure that only those persons who are dangerous to themselves, to others or to property, are involuntarily committed.
Under the civil commitment statute, a person may be involuntarily committed either by referral of a State-designated screening center under N.J.S.A. 30:4-27.10a, or by submission of two clinical certificates to the court, at least one of which is prepared by a psychiatrist under N.J.S.A. 30:4-27.10b. In either case, the standard for determining whether a patient should be involuntarily committed is the same:
A person shall not be involuntarily committed to a short-term care or psychiatric facility, or special psychiatric hospital unless the person is mentally ill and that mental illness causes the person to be dangerous to self or dangerous to others or property, and appropriate facilities or services are not otherwise available.
[N.J.S.A. 30:4-27.9b].
See also Fair Oaks Hosp. v. Pocrass, 266 N.J. Super. 140, 145-149, 628 A.2d 829 (Law Div. 1993) (outlining the procedures and policies behind the commitment process).
Our courts have emphasized that involuntary commitment should only occur if the patient "is likely to pose a danger to himself or to society" and if there is a "substantial risk of dangerous conduct within the reasonably foreseeable future." State v. Krol, 68 N.J. 236, 257, 260, 344 A.2d 289 (1975); see also Matter of Commitment of B.S., 213 N.J. Super. 243, 248, 517 A.2d 146 (App.Div. 1986). "The civil commitment process must be narrowly circumscribed because of the extraordinary degree of state control it exerts over a citizen's autonomy." In re S.L., 94 N.J. 128, 139, 462 A.2d 1252 (1983). Moreover, "involuntary commitment ... is a profound and dramatic curtailment of a person's liberty and as such requires meticulous adherence to statutory and constitutional criteria." Fair Oaks Hosp. v. Pocrass, supra, 266 N.J. Super. at 149, 628 A.2d 829; see also Matter of Commitment of Raymond S., 263 N.J. Super. 428, 432, 623 A.2d 249 (App.Div. 1993).
Balanced against this cautious approach to involuntary civil commitment is the notion that such commitment is best decided by *300 appropriate mental health care professionals, and, as such, the commitment decision is discretionary. To protect this discretionary procedure and to allow mental health care workers to perform their jobs freely, the Legislature has provided immunity from civil and criminal liability for those involved in the commitment of an individual for mental health reasons. N.J.S.A. 30:4-27.7 governs this immunity and, in pertinent part, provides:
a. A law enforcement officer, screening service or short-term care facility designated staff person or their respective employers, acting in good faith pursuant to this act who takes reasonable steps to assess, take custody of, detain or transport an individual for the purposes of mental health assessment or treatment is immune from civil and criminal liability.
Thus, those involved in the involuntary commitment process enjoy an absolute immunity from civil or criminal liability if they acted in good faith and took reasonable steps toward effectuating the commitment.
We are satisfied from our study of the record and the arguments presented that defendants demonstrated a prima facie right to immunity from liability under N.J.S.A. 30:4-27.7. The pleadings, depositions, certifications and exhibits demonstrate that defendants acted in good faith and took reasonable steps in connection with the involuntary commitment of plaintiff. Defendants engaged in a systematic, orderly and thorough evaluation of plaintiff prior to involuntarily committing him. The process began when plaintiff was interviewed by Colts Neck police officers, who ultimately took him to the Riverview Medical Center for evaluation. Plaintiff was medically cleared at the emergency room by Dr. Starkey before the psychiatric screening process began. Webb interviewed and evaluated plaintiff and completed the appropriate psychiatric examination form. Webb then discussed her findings and evaluation with Tambini. Webb also contacted Dr. Wong to advise that plaintiff was being screened for possible commitment and discussed her evaluation with Dr. Wong. Tambini interviewed and evaluated plaintiff, completing the three-page Monmouth Medical Center Screening Form. Tambini then discussed his evaluation with Webb and Dr. Wong. Finally, Dr. *301 Wong interviewed and evaluated plaintiff. Based on these evaluations, defendants were of the opinion that plaintiff presented a danger to himself and others and that he should be involuntarily committed.
Under the circumstances, Dr. Wong properly executed the physician's certificate for plaintiff's involuntary commitment. Such commitment did not violate the letter or spirit of N.J.S.A. 30:4-27.1 et seq. or any other standard of professional care. In our view, defendants made a prima facie showing that they acted in good faith and took reasonable steps to assess, take custody of and detain plaintiff for purposes of mental health assessment or treatment and, therefore, they were entitled to immunity under N.J.S.A. 30:4-27.7.
Since defendants demonstrated a prima facie right to summary judgment, plaintiff was required to show by competent evidential material that a genuine issue of material fact existed. James Talcott, Inc. v. Shulman, 82 N.J. Super. 438, 443, 198 A.2d 98 (App.Div. 1964); Heljon Management Corp. v. Di Leo, 55 N.J. Super. 306, 312, 150 A.2d 684 (App.Div. 1959); Goldome Rlty. Cred. Corp. v. Harwick, 236 N.J. Super. 118, 124, 564 A.2d 463 (Ch.Div. 1989) (citing Robbins v. Jersey City, 23 N.J. 229, 241, 128 A.2d 673 (1957)). The reason for this "is to afford litigants protection against groundless claims and frivolous defenses." Heljon Management Corp. v. Di Leo, supra, 55 N.J. Super. at 312, 150 A.2d 684. See also Robbins v. Jersey City, supra, 23 N.J. at 241, 128 A.2d 673.
"[T]he standards [governing the disposition of a summary judgment motion] are to be applied with discriminating care so as not to defeat a summary judgment if the movant is justly entitled to one." Judson v. Peoples Bank & Trust Co. of Westfield, supra, 17 N.J. at 74, 110 A.2d 24. Accord Goldome Rlty. Cred. Corp. v. Harwick, supra, 236 N.J. Super. at 124, 564 A.2d 463. Furthermore, "if the opposing party offers no affidavits or matter in opposition, or only facts which are immaterial or of an insubstantial nature, a mere scintilla, `fanciful, frivolous, gauzy or merely *302 suspicious,' he will not be heard to complain if the court grants summary judgment, taking as true the statement of uncontradicted facts in the papers relied upon by the moving party, such papers themselves not otherwise showing the existence of an issue of material fact." Judson v. Peoples Bank & Trust Co. of Westfield, supra, 17 N.J. at 75, 110 A.2d 24 (citations omitted).
There is nothing in this record to show or even suggest that defendants did not act in good faith in this matter or that they did not take reasonable steps in involuntarily committing plaintiff. Dr. Fine's report does not raise a genuine issue of material fact as to whether defendants deviated from standard commitment procedures when involuntarily committing plaintiff. The pivotal issue of whether defendants, acting in good faith, took reasonable steps to assess, take custody of, detain or transport plaintiff for the purpose of mental health assessment or treatment cannot be decided without competent expert testimony establishing an appropriate standard of care and that such standard was breached by defendants. Plaintiff failed to provide such testimony here.
While Dr. Fine may have criticized defendants' failure to corroborate plaintiff's statements to the Colts Neck police officers which were passed on to defendants, Dr. Fine failed to identify any applicable standard of care or state that such standard was violated by any of these defendants. Dr. Fine's report, considered most indulgently, consists primarily of a series of unanswered questions. Although many of the questions hint at negligence, the report falls far short of stating an applicable standard of care and concluding that defendants deviated from that standard. The only portion of the report in which any affirmative statements are made towards that end appears where Dr. Fine states:
It is also my opinion that the quality of care given by all the hospitals in assessing Mr. Ziemba's condition was inadequate in that they made no "apparent" effort to obtain direct information from the wife at the time of admission on the face of constant denial by Mr. Ziemba about suicidal ideation, as well as no overt suicidal behavior by the [patient] at the time of admission or by history of suicidal behavior in the past.
No adequate description was obtained of the patient's mental state at the time of admission that would indicate a high potential risk for suicide e.g. command *303 hallucinations to commit suicide, intoxicated state, feelings of hopelessness and helplessness, extreme guilt, prolonged weeping etc. or history of symptoms of a major depression in the recent past.
This statement refers only to the "quality of care given by all the hospitals." It does not assert that any of the individual defendants deviated from an applicable standard of care. Moreover, even as to "the hospitals," which presumably includes Riverview Medical Center, Dr. Fine does not assert that it failed to meet a standard of care generally accepted in the medical field; instead, he merely asserts a personal opinion as to the inadequacy of care.
Dr. Fine's report, consisting of questions and "opinions," was not sufficient to withstand defendants' motions for summary judgment. Consequently, there being no genuine issue of material fact as to whether defendants acted in good faith and took reasonable steps in evaluating and involuntarily committing plaintiff, summary judgment should have been granted in favor of defendants on the ground that they were immune from liability under N.J.S.A. 30:4-27.7.
Accordingly, the orders under review are reversed and summary judgment is hereby entered in favor of defendants.