**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0697-23

ARTULDE POINT DU JOUR,

    Plaintiff-Appellant,

v.

TOWNSHIP OF UNION, TRINITAS
REGIONAL MEDICAL CENTER,[1]
DETECTIVE DONALD COOK,
WILSON LIMAGE,[2] OFFICER
DELVALLE, BADGE #3259,[3]
and SYLVIA ESCOBEDO,[4]

    Defendants-Respondents,

and

STATE OF NEW JERSEY,

    Defendant.

_____

_____

[1] Improperly pled as Trinitas Regional Medical Center Hospital.

[2] Improperly pled as Limage Wilson.

[3] DelValle's first name is not identified in the record.

[4] Improperly pled as Sylvia Escobar.

Argued October 15, 2025 – Decided April 24, 2026

Before Judges Rose, DeAlmeida and Torregrossa-O'Connor.

On appeal from the Superior Court of New Jersey, Law Division, Union County, Docket No. L-0045-21.

Eldridge Hawkins argued the cause for appellant (Cecile D. Portilla, Attorney at Law, and Eldridge Hawkins, attorneys; Cecile D. Portilla, on the briefs).

Gregory D. Emond argued the cause for respondents Township of Union, Detective Donald Cook, Wilson Limage, and Officer DelValle (Antonelli Kantor Rivera PC, attorneys; Jarrid H. Kantor, of counsel and on the brief; Gregory D. Emond and Michael A. Sabony, on the brief).

Randall S. Watts argued the cause for respondents Trinitas Regional Medical Center and Sylvia Escobedo (Marshall Dennehey, PC, attorneys; Randall S. Watts, on the brief).

PER CURIAM

Plaintiff Artulde Point Du Jour appeals from the summary judgment dismissal of her January 19, 2022 Law Division amended complaint against defendants Township of Union, Trinitas Regional Medical Center (TRMC), Detective Donald Cook, Wilson Limage, Officer DelValle, and Sylvia

A-0697-23

Escobedo.[5]  Plaintiff challenges an October 23, 2023 order granting summary judgment to the Township, and its law enforcement employees, Cook, Limage, and DelValle (collectively, Township defendants), under N.J.S.A. 30:4-27.7, the good faith exception to the civil commitment statute, N.J.S.A. 30:4-27.1 to -27.23; and a May 13, 2022 order dismissing her claims against TRMC and its social worker employee, Escobedo (together, the TRMC defendants), for failure to provide an affidavit of merit (AOM) under N.J.S.A. 2A:53A-27 of the AOM statute, N.J.S.A. 2A:53A-26 to -29.

The genesis of this appeal is the yearslong contentious dispute between plaintiff and her neighbor, Dean Rocco, culminating in a February 12, 2020 outreach visit to plaintiff's home by Limage, DelValle, and Escobedo. Following the one-hour interaction with plaintiff, Escobedo requested police transfer plaintiff to TRMC for a mental health evaluation against her will.  In her five-count amended complaint, plaintiff alleged defendants violated her constitutional rights by discriminating against her on the bases of race, national origin, and "perceived psychiatric abnormality."  Asserting defendants caused

---

[5]  Plaintiff does not appeal from the July 25, 2022 order granting defendant State of New Jersey's motion to dismiss her claims pursuant to Rule 4:6-2(e). Accordingly, the State is not a party to this appeal.

A-0697-23

her to "endure severe emotional distress" as a result of the involuntary transfer, plaintiff sought compensatory and punitive damages.

In her merits brief, plaintiff raises eight overlapping points, arguing there was ample evidence in the motion record she was not a danger to herself or others when police forcibly removed her from her home. Plaintiff therefore contends the record does not support the court's finding the Township defendants acted in good faith when transporting plaintiff to TRMC for a mental health evaluation.

In her ninth point, plaintiff argues the motion court erroneously determined her claims against the TRMC defendants sounded in medical negligence. Noting she pled intentional torts and civil rights violations, plaintiff contends she was not required to file an AOM against the TRMC defendants. Plaintiff further asserts because Escobedo was not a licensed professional within the meaning of the AOM statute, an AOM was not required to support her claims against Escobedo and, by extension, plaintiff was not required to provide an AOM to support her vicarious liability contentions against TRMC.

On de novo review, see Boyle v. Huff, 257 N.J. 468, 477 (2024), we affirm the October 23, 2023 summary judgment order. Employing the same de novo review of a court's order interpreting the AOM statute, see Meehan v. Antonellis,

226 N.J. 216, 230 (2016), we also affirm the May 13, 2022 order as to plaintiff's personal injury claim against TRMC for failure to provide an AOM, but vacate the order to the extent plaintiff alleges vicarious liability against TRMC. Because social workers are not licensed persons under the AOM statute, we also vacate the May 13, 2022 order as to plaintiff's personal injury claim against Escobedo. We therefore affirm in part, and reverse and remand in part.

## I. Factual Circumstances and Procedural Posture

We summarize the pertinent facts from the voluminous motion record in a light most favorable to plaintiff as the non-moving party. See Brill v. Guardian Life Ins. Co. of Am., 142 N.J. 520, 540 (1995) (Rule 4:46-2 summary judgment dismissals); Printing Mart-Morristown v. Sharp Elecs. Corp., 116 N.J. 739, 746 (1989) (Rule 4:6-2(e) dismissals for failure to state a cause of action); N.J.S.A. 2A:53A-29 (recognizing the failure to provide an AOM is equivalent to a dismissal motion for failure to state a cause of action). Prior to the February 12, 2020 incident date, plaintiff and Rocco filed various incident reports against each other.

A-0697-23

In May 2016, Rocco reported to police plaintiff approached his teenage sons and stated, "I hope you drop dead."[6] When Rocco confronted plaintiff about the remark, she allegedly replied, "[F]uck you leave me alone, you always are looking to get me in trouble, you are racist that's what you are." Plaintiff then exposed her buttock and said, "[T]alk to my ass." Rocco recorded the incident on his cell phone. Rocco later told Cook he and plaintiff engaged in litigation over the incident, and both agreed to stay away from each other.

In August 2019, without naming Rocco, plaintiff filed two citizen's reports, first claiming someone removed screws from a utility box on her property, then asserting when she arrived home she smelled a chemical odor emanating from her air conditioning unit. Plaintiff told police her neighbor had harassed her and she believed he was trying to kill her.

In January 2020, plaintiff filed another citizen's report, claiming her neighbor was watching her house, broke a screen door and window, made a copy of her keys, and entered her home while she was working. Plaintiff stated the neighbor stole clothes, pictures, food, and other items from her house. Limage and another officer reported to plaintiff's home. According to Limage's report,

---

[6] In view of the issues raised on this appeal, throughout our opinion we quote plaintiff verbatim. We intend no disrespect in doing so.

6

plaintiff told the officers that for several months she noticed her personal belongings were moved around her house. Limage inspected the window, but noted "no signs of burglary or damage to property."

That same month, plaintiff filed another report claiming Rocco damaged a computer delivered to her house. She repeated her previous claim that Rocco had a key to her home and car, and had been inside her home multiple times. She also claimed Rocco put something in her car's engine causing damage. Assigned to investigate plaintiff's allegations, Cook reviewed the prior reports involving plaintiff and Rocco, and viewed the body worn camera (BWC) footage from Limage's investigation earlier that month. In his report, Cook noted the BWC footage depicted notes on Post-its "all over inside and outside the house." When he responded to plaintiff's home the following day, Cook saw the notes. He also observed "squeezed limes/lemons on the front steps" and a "type of wet herb or sage at the top of the steps," which he surmised could indicate "some type of ritual/belief." Cook also spoke with Rocco, who confirmed the 2016 incident involving Rocco's children.

Believing plaintiff exhibited signs of paranoia indicative of a mental health episode, on January 30, 2020, Cook contacted the Family Relations Bureau. The detective lieutenant assigned to the Bureau explained Cook could

7

contact TRMC to conduct a mental health evaluation if "deemed necessary" consistent with the statutory criteria. But Cook decided "to speak with [plaintiff] in person before contacting [TRMC]."

A few days later, on February 6, 2020, Cook received an email from plaintiff with images of the purported damage to her computer. Cook observed "minor damage from shipping." Plaintiff also provided other photos, including a screwdriver and screen door. In the email, plaintiff claimed the screwdriver was not hers, explaining:

> They left it or forgot it inside my car. They kept going inside my garage inside my car and steel things and dirty the chair and put feces in my car. I changed garage key . . . and they got in there. They have my car key because I locked the car inside the garage but they get inside the car anytime they want. Now, they drop something inside the engine and it's making a noise. Mechanic said to me they can not fix it. I have to get another car. The car was running fine and one day I went in the garage it was making a loud noise. My screen side door they broke it - see pictures and many more other things.

In his February 10, 2020 responding email, Cook advised there was no evidence plaintiff's neighbors broke into her home and, as such, no charges would be filed. Plaintiff replied via email, reiterating her claim that her neighbor broke into her home, stating, "These people have some magic to go in my house

8

and they are not appearing in the camera" she installed. Plaintiff reiterated her request for police assistance.

The following day, on February 11, 2020, Cook interviewed another neighbor, who indicated she and her family did not socialize with plaintiff. This neighbor denied she damaged plaintiff's property or had a key to her home. The neighbor told Cook she heard plaintiff, "yelling inside her house" and observed plaintiff "talking to herself." After this conversation, Cook contacted TRMC, shared the information developed during his investigation, and requested a mental health evaluation of plaintiff.

The next day, Cook drove to the vicinity of plaintiff's home "to watch her house and possibly give her some peace of mind." When he arrived, Cook saw plaintiff exit her home and, as he drove past her, "hear[d] her talking out loud." He did not otherwise interact with plaintiff. Cook observed plaintiff's home for approximately one hour, but did not see any suspicious activity. Cook later emailed plaintiff to advise of his visit.

Plaintiff responded with a lengthy disjointed email. After thanking Cook for watching her home, plaintiff insinuated rice was stolen from her kitchen. She then asserted: "They broke my printer." Plaintiff also claimed, "they steal" her mail, break items in her home, are "jealous of me," and "are doing these

9

malicious act to push me out quickly."  Referencing the covert outside camera

she planned on installing to catch her neighbors plaintiff stated:

> I don't know if we will ever because these people can turn into cats or dogs and fly like a birds.  They are not 100 % human.

Noting the camera placed inside her home, plaintiff asserted:

> [S]ometimes I see a blue light flashing inside the house in some room of the house.

> I was reading online if a thief want to steal you and does not want them to show in camera they use a flash light or a blue flash light directly at the camera.  As a result, you can never see them.  No wonder I can not catch them in the camera.

> This is driving me crazy.  I can not sleep in peace and i am afraid to eat in the house.
> Any food i leave in the refrigerator or anything I open, I don't use it anymore.

> In October I went home the whole house smell poison. I had to throw out everything powder and liquid and cook food.

> They taught they got me I was going to die.  That week and following they kept looking at me funny thinking how come she is still alive.

Further noting her friends and family did not understand why she could

not "catch them on camera," plaintiff explained:

> I did not understand it either but now I do bec they can pass in front of you or they go inside my house

10

A-0697-23

invisible. Sometimes, I saw some flashing blue light flying inside the house.
They steal my important papers and they are in all my personal business, my computer they sign in. I had to change the login sign in screen.

Plaintiff also claimed, "They sent evil things after my children for them not to stay in the house so I go to work they have plenty times to get in." Noting she planned to move in a few months and rent her home, plaintiff feared "they are going to scare my tenants away by doing the same thing to them." In the closing line of her email, plaintiff stated: "I don't want to be a pain but this is terrified me."

That same day, Cook spoke with a TRMC screener and disclosed his observations about plaintiff. The screener stated plaintiff likely suffered from "Delusional Syndrome" and a screener would be sent to her home.

Around 10:30 p.m., on February 12, 2020, Escobedo, Limage, and DelValle responded to plaintiff's home for an outreach visit. The officers' BWCs recorded the encounter.[7] When deposed, plaintiff stated she allowed the three individuals to enter her home because Escobedo said she was there "to see what's happening in the house" regarding plaintiff's "missing" items.

---

[7] The BWC footage was included in the Township defendants' summary judgment motion and referenced in the court's decision.

A-0697-23

Escobedo spoke with plaintiff inside the home. At deposition, Escobedo stated plaintiff repeated her claims that her neighbors broke into her home, deleted footage from her cameras so she could not catch them, broke into her car, smeared feces on the car's passenger seat, and stole her personal belongings. Escobedo also said plaintiff "made statements regarding people working magic on her, making things disappear." Escobedo testified during their conversation, plaintiff "was sweating profusely," suggesting she either had an underlying medical condition or was "trying to convince [herself] that her reality, as what she believed it to be, . . . was actually happening," possibly caused by "delusional thinking." Plaintiff denied she took any medications or had a history of mental health issues.

According to Escobedo, during their one-hour interaction, plaintiff exhibited good personal hygiene. She was not suicidal, homicidal, or "an imminent threat to herself or others." However, Escobedo contacted the emergency room psychiatrist to report her belief that plaintiff did not appear to be "in the right state of mind" and "met the criteria for a face-to-face evaluation." Escobedo testified the psychiatrist concurred with her recommendation. Accordingly, Escobedo completed the requisite form requesting police transfer plaintiff to a screening facility pursuant to N.J.S.A. 30:4-27.6(b). In the form,

12

Escobedo certified plaintiff "is in need of involuntary commitment, that is, s[]he is dangerous to self, others, or property because of a mental illness and is unwilling to go to the screening service on . . . her own."

Plaintiff objected to the transfer. When deposed, plaintiff explained she told Escobedo and the officers she did not need a psychiatric evaluation and did not have mental health issues. Plaintiff further testified she felt threatened by the officers' presence in her home because they were armed, but acknowledged they did not "draw their weapons at any time during this incident." Plaintiff claimed the officers said they would "carry" her if she did not go willingly, but acknowledged they did not touch her. At some point during the interaction, the paramedics arrived by ambulance and entered her home, but plaintiff apparently entered the ambulance without assistance. Limage rode in the ambulance with plaintiff.

The ambulance arrived at TRMC shortly after midnight on February 13, 2020. Plaintiff signed a consent for admission and treatment form. Following a physical evaluation, the emergency room doctor cleared plaintiff for a psychological evaluation. The doctor noted plaintiff denied "any homicidal or suicidal . . . ideation," and exhibited no agitation.

13

In the emergency room, another TRMC screener evaluated plaintiff, who maintained her neighbors were breaking into her home, but denied suicidal or homicidal ideations. The screener conferred with the on-call psychiatrist, who recommended transferring plaintiff to New Point Campus, the satellite campus for a psychiatric evaluation. When told about the evaluation, plaintiff became "irritated and anxious." At some point, the emergency room doctor ordered a sedative. In her discovery responses, plaintiff certified she "yelled" and "screamed" at the staff, and refused the medication. Plaintiff further claimed the nurse called six security men to hold her down to allow the nurse to administer the medication. But plaintiff asserted after she told the nurse "[she] would sue her too," the nurse told security to stop.

Upon arrival at New Point Campus, plaintiff was evaluated by a counselor, who noted plaintiff did not appear distressed or exhibit behavioral issues. Throughout the rest of the day, nurses observed plaintiff appeared calm; no complaints or issues were reported. Personnel spoke with plaintiff's family: her daughter stated plaintiff did not have a history of mental health issues; her sister said plaintiff appeared lonely after her children moved from the home; her brother said, during his telephone call with plaintiff the previous night, he did

14

not notice anything wrong with plaintiff, but acknowledged plaintiff was "frustrated" with her neighbor.

The following morning, on February 14, 2020, plaintiff appeared calm and cooperative. Around noon, the on-call psychiatrist noted the absence of any "acute psychiatric problems or issues" requiring hospitalization. Plaintiff stated she did not wish to hurt herself or her neighbors, but agreed to outpatient treatment. Plaintiff was discharged shortly thereafter.

Plaintiff commenced the present action in October 2020, before filing her initial complaint, by moving to file a late notice of tort claim, N.J.S.A. 59:8-9. Thereafter, the matter followed a tortured procedural path, the details of which are not pertinent to the issues raised on this appeal, other than the following events.

On February 8, 2022, the court denied the TRMC defendants' summary judgment motion on procedural grounds, finding the application lacked proper citation to the record and legal conclusions were unsupported by the facts. In their moving brief, the TRMC defendants argued they were entitled to immunity under the good faith exception to the civil commitment statute, N.J.S.A. 30:4-27.7(a).

A-0697-23

Thereafter, the TRMC defendants moved to dismiss plaintiff's "direct claims against TRMC pursuant to N.J.S.A. 2A:43A-27." In their motion, the TRMC defendants did not renew their immunity argument.

On May 13, 2022, the court issued an order dismissing "plaintiff's claims of professional negligence against TRMC . . . with prejudice for failure to serve an [AOM] as to TRMC."[8] Thereafter, plaintiff twice moved for reconsideration.

On June 28, 2022, the court issued an order and accompanying statement of reasons denying plaintiff's first reconsideration motion. Pertinent to this appeal, the court clarified an AOM was required because TRMC "staff . . . who allegedly examined and recommended [p]laintiff for mental health treatment [we]re . . . 'licensed persons'" under the AOM statute. The court further determined plaintiff's assertions that TRMC failed both "to properly train Escob[edo]" and follow the applicable commitment law "require[d] expert testimony and an [AOM]."

On September 22, 2022, the court issued an order and accompanying statement of reasons, denying plaintiff's second reconsideration motion. Noting plaintiff's request for reconsideration was improperly "intermixed" with

---

[8] Although the order reflects the court dismissed plaintiff's claims against TRMC, in its statement of reasons, the court also dismissed plaintiff's claims against Escobedo.

"numerous purported discovery requests," the court determined the interests of justice did not warrant reconsideration.

II. <u>Dismissal of Plaintiff's Claims Against the TRMC Defendants</u>

We first consider plaintiff's challenges to the May 13, 2022 order granting the TRMC defendants' motion to dismiss her professional negligence claims for failure to file an AOM. Plaintiff maintains she pled constitutional and statutory violations and, as such, an AOM was not required to pursue her claims against the TRMC defendants. She further argues her claims against Escobedo did not require an AOM because Escobedo was a social worker, who is not included in the definition of a "licensed person" under N.J.S.A. 2A:53A-26. Plaintiff also asserts her claims for assault and battery, premised on TRMC staff holding her down and injecting her with medicine against her will, did not require an AOM.

The TRMC defendants urge us to affirm the May 13, 2022 order. They further argue plaintiff failed to raise before the motion court her claim that, as a social worker, an AOM was not required for Escobedo. The TRMC defendants also assert Escobedo acted as "eyes and ears" for the on-call psychiatrist, who ordered plaintiff's psychological evaluation and she therefore fell within the purview of the hospital, requiring an AOM.

As our Supreme Court has reiterated, the "dual purposes of the AOM statute are 'to weed out frivolous lawsuits early in the litigation while, at the same time, ensuring that plaintiffs with meritorious claims will have their day in court.'" Wiggins v. Hackensack Meridian Health, 259 N.J. 562, 575 (2025) (quoting Ferreira v. Rancocas Orthopedic Assocs., 178 N.J. 144, 150 (2003)); see also Meehan, 226 N.J. at 229. The failure to provide an AOM is considered "a failure to state a cause of action" under N.J.S.A. 2A:53A-29, and warrants dismissal of the complaint with prejudice. A.T. v. Cohen, 231 N.J. 337, 346 (2017) (quoting N.J.S.A. 2A:53A-29).

The AOM statute provides, in pertinent part:

> In any action for damages for personal injuries, wrongful death or property damage resulting from an alleged act of malpractice or negligence by a licensed person in his profession or occupation, the plaintiff shall, within 60 days following the date of filing of the answer to the complaint by the defendant, provide each defendant with an affidavit of an appropriate licensed person that there exists a reasonable probability that the care, skill or knowledge exercised or exhibited in the treatment, practice or work that is the subject of the complaint, fell outside acceptable professional or occupational standards or treatment practices. The court may grant no more than one additional period, not to exceed 60 days, to file the affidavit pursuant to this section, upon a finding of good cause.
>
> [N.J.S.A. 2A:53A-27.]

A-0697-23

Accordingly, to comply with the AOM statute, a plaintiff must: (1) obtain an AOM from a "licensed person" attesting to the professional negligence at issue; and (2) provide the AOM to the defendant within sixty days, or within the additional sixty-day extension period. See Ferreira, 178 N.J. at 149-50 (citing N.J.S.A. 2A:53A-27). The AOM statute defines a "licensed person" as "any person who is licensed" in one of seventeen specific professions, including health care facilities, physicians, and registered professional nurses. N.J.S.A. 2A:53A-26. Social workers are not included in the definition. See ibid.

Our Supreme Court has made clear, regardless of how a claim is pled, the following analysis determines whether an AOM is required:

> It is not the label placed on the action that is pivotal but the nature of the legal inquiry. Accordingly, when presented with a tort or contract claim asserted against a professional specified in the statute, rather than focusing on whether the claim is denominated as tort or contract, attorneys and courts should determine if the claim's underlying factual allegations require proof of a deviation from the professional standard of care applicable to that specific profession. If such proof is required, an [AOM] is required for that claim, unless some exception applies.
>
> [Couri v. Gardner, 173 N.J. 328, 340 (2002).]

A-0697-23

In Couri, the Court established three factors for consideration when determining whether the AOM statute applies to a particular claim against a "licensed person":

> (1) whether the action is for "damages for personal injuries, wrongful death or property damage" (nature of injury); (2) whether the action is for "malpractice or negligence" (cause of action); and (3) whether the "care, skill or knowledge exercised or exhibited in the treatment, practice or work that is the subject of the complaint [] fell outside acceptable professional or occupational standards or treatment practices" (standard of care).
>
> [Id. at 334 (alteration in original) (quoting N.J.S.A. 2A:53A-27).]

Following the Court's decision in Couri, we stated when evaluating the cause of action and the nature of the injury to determine whether a claim requires an AOM, "courts must look to the underlying factual allegations, and not how the claim is captioned in the complaint." Triarsi v. BSC Grp. Servs., LLC, 422 N.J. Super. 104, 114 (App. Div. 2011) (quoting Syndicate 1245 at Lloyd's v. Walnut Advisory Corp., 721 F. Supp. 2d 307, 315 (D.N.J. 2010)). Thus, "the nature of the proof" is the controlling factor. Ibid. (quoting Syndicate 1245 at Lloyd's, 721 F. Supp. 2d at 315). Relevant here, we have also recognized intentional torts requiring proof of malice are not subject to the AOM statute. See Perez v. Zagami, LLC, 443 N.J. Super. 359, 361 (App. Div. 2016).

20

In the present matter, the motion court found plaintiff's claims against the TRMC defendants sounded in professional negligence notwithstanding plaintiff's contention that in her amended complaint, she alleged intentional conduct and "did not use the explicit term[,] 'malpractice.'" To support its decision, the court quoted the following language from the amended complaint, which alleged the TRMC defendants "acted in a reckless, wanton disregard for the technicalities of the law that requires a professional determination that [p]laintiff was a danger to herself or others" before transporting her to TRMC "against her will" and "[n]o determination by any professional was made" establishing plaintiff met the criteria for involuntary commitment under the governing law. (Emphasis removed). According to the court, these allegations set forth "violations of the professional standard of care that was required of the TRMC [d]efendants."

The motion court elaborated: "Plaintiff's allegations against the TRMC [d]efendants [we]re not simply rooted in discrimination or in an administrative failure as [p]laintiff seeks to contend, but instead allege improper mental health screening and subsequent action by the TRMC [d]efendants that [p]laintiff further contends violated numerous statutory and constitutional rights." The court therefore was satisfied plaintiff's amended complaint satisfied Couri's

A-0697-23

third factor, "the 'care, skill or knowledge exercised or exhibited in the treatment, practice or work that is the subject of the complaint [] fell outside acceptable professional or occupational standards or treatment practices.'" 173 N.J. at 334 (alteration in original). The court therefore determined notwithstanding "the semantic classification," because plaintiff's allegations required proof the TRMC defendants deviated from the standard of care, plaintiff's failure to provide an AOM warranted dismissal of her amended complaint with prejudice.

We discern no basis to disturb the May 13, 2022 order dismissing plaintiff's claims against TRMC. Although plaintiff correctly argues an AOM is required only for malpractice and negligence claims, a court is not constrained by the label assigned in the complaint. Couri, 173 N.J. at 340. Considering the allegations in the complaint, we conclude, as did the motion court, plaintiff's claims against the TRMC defendants were premised on a deviation from an accepted standard of medical care. See ibid.

In particular, plaintiff asserted the TRMC defendants failed to follow accepted standards in authorizing plaintiff's involuntary commitment and treating her at the hospital. Further, plaintiff's complaint alleged TRMC failed to follow the standards set forth in the civil commitment statute and failed to

adequately evaluate her condition.  Although plaintiff attempted to label her claims as intentional torts and civil rights violations, the gravamen of plaintiff's claims is that the hospital rendered negligent care.  See Alpert, Goldberg, Butler, Norton & Weiss, P.C. v. Quinn, 410 N.J. Super. 510, 540 (App. Div. 2009) (noting that where the pleadings placed at issue the work product and competency of a law firm, an AOM was required).  Accordingly, as the motion court found, although plaintiff's claims were not styled as malpractice or negligence, the underlying facts required proof of the hospital's "deviation from [its] statutorily mandated standard of care for mental health service providers" and thus "require[d] an [AOM]."  See Couri, 173 N.J. at 340.  To the extent plaintiff alleged intentional torts against the TRMC defendants, those claims also fail.  See Perez, 443 N.J. Super. at 361.

We part company, however, with the motion court's conclusion that plaintiff's allegations against Escobedo fail for failure to provide an AOM.  As a social worker, Escobedo's profession did not fall within the definition of a "licensed person" under N.J.S.A. 2A:53A-26.  A plaintiff is not required to provide an AOM for a professional negligence claim where the profession is not listed under the definition of licensed persons.  See Gilligan v. Junod, 474 N.J. Super. 39, 43-44 (App. Div. 2022) (concluding an AOM was not required to

23

pursue a professional negligence claim against a licensed practical nurse because that professional is not defined as a licensed person under N.J.S.A. 2A:53A-26). Accordingly, the professional negligence claims against Escobedo should not have been dismissed on that basis.

Further, in her amended complaint, plaintiff alleged "[Escobedo] at all times acted as an agent of [TRMC]." Accordingly, under her loosely pled vicarious liability theory, plaintiff was not required to serve an AOM on TRMC. See Haviland v. Lourdes Med. Ctr. of Burlington Cnty., Inc., 250 N.J. 368, 372 (2022) (holding "a vicarious liability claim against a licensed health care facility based only on the conduct of its non-licensed employee" was not subject to the AOM statute).

Accordingly, we affirm the May 13, 2022 order as to plaintiff's direct claims against TRMC for failure to provide an AOM. On remand, the court shall afford plaintiff and the TRMC defendants an opportunity to brief the issues and argue whether plaintiff can prove her allegations against the TRMC defendants on the existing record. See Ziemba v. Riverview Med. Ctr., 275 N.J. Super. 293, 302 (App. Div. 1994) (recognizing "[t]he pivotal issue of whether" the defendant followed the civil commitment statute "cannot be decided without competent expert testimony establishing an appropriate standard of care and that such

standard was breached by defendants"); Vasilik v. Federbush, 327 N.J. Super. 6, 11 (App. Div. 1999) (observing because the plaintiff presented expert testimony at trial that his son was suicidal and in need of hospitalization, the defendant hospital should have involuntarily committed the son).

For the reasons that follow, the remand proceedings shall also encompass the TRMC defendants' responding arguments to plaintiff's points concerning the October 23, 2023 order.  Specifically, because the TRMC defendants did not join the Township defendants' summary judgment motion, the court on remand shall consider any arguments raised regarding the following issues.

III.  Dismissal of Plaintiff's Claims against the Township Defendants

We turn to plaintiff's multiple challenges to the October 23, 2023 order granting summary judgment to the Township defendants under N.J.S.A. 30:4-27.7(a) of the civil commitment statute and for failure to support her civil rights, equal protection, false light, and intentional infliction of emotional distress claims.

In her first point, plaintiff argues the Township defendants were not entitled to immunity under N.J.S.A. 30:4-27.7(a) because they did not act in "good faith" as required by the statute.  Plaintiff contends the court "unreasonably agreed with the police defendants that there was a problem with

[her] state of mind because [she] made statements about poisoning[,] thefts, voodoo, magic[,] and [various animals]." Plaintiff argues her statements merely were "analogies." Plaintiff further contends police lacked good faith because she did not meet the criteria for involuntary commitment in view of Escobedo's testimony plaintiff was not homicidal, suicidal, or dangerous to herself or others. Citing an unpublished opinion, plaintiff also claims the Township's failure to establish a policy preventing the discrimination of mentally ill individuals was a "fatal flaw" to its immunity argument.

In her one-page second point, plaintiff claims the Township defendants and the TRMC defendants violated her civil rights. However, in her brief argument under this point and overlapping contentions raised in her third and fourth points, plaintiff apparently limits her civil rights violations to the Township defendants. Quoting her affidavit in opposition to the Township defendants' motion, plaintiff argues she supported her claim that she was treated differently from her "white neighbor." For example, she asserts the Township defendants improperly "accused the black Haitian plaintiff who believes in Voodoo alone of filing too many complaints," while her "white neighbor" filed many more complaints against her.

26

In her fifth point, plaintiff asserts the court incorrectly determined she failed to assert an intentional infliction of emotional distress claim. Plaintiff argues the evidence demonstrates police kidnapped her from her home and transported her "to a mental facility against [her] will," where she was forcibly administered psychiatric medication. Plaintiff argues the officers' actions caused her mental suffering, shame and humiliation.

In her sixth point, citing federal law, plaintiff asserts the Township defendants subjected her to "State Created Danger." Claiming she asserted a cause of action for battery, plaintiff argues she was entitled to damages. In her seventh point, plaintiff claims genuine issues of fact precluded summary judgment against the Township defendants. In her eighth point, plaintiff argues summary judgment was erroneously entered because the Township defendants violated her right to privacy.

The Township defendants support the motion court's decision. In their responding brief, the TRMC defendants assert plaintiff's challenges to the October 23, 2023 order do not apply to them. The TRMC defendants note they were dismissed with prejudice from the action pursuant to the May 13, 2022 order, before the Township defendants moved for summary judgment. Accordingly, the court did not address the merits of the TRMC defendants' civil

27

immunity defenses. The TRMC defendants further note their attorney appeared at oral argument before the motion court and stated, had the TRMC defendants remained in the action, they would have asserted Escobedo's actions were immune under N.J.S.A. 30:4-27.7. For the first time on appeal, the TRMC defendants address the merits of their immunity argument and respond to most of plaintiff's remaining challenges to the October 23, 2023 order. On reply, plaintiff does not address this procedural irregularity.

On de novo review of a decision on summary judgment, we employ the same standard as the motion court. We review the record to determine whether there are material factual disputes and, if not, whether the undisputed facts viewed in the light most favorable to plaintiff, as the non-moving party, nonetheless entitle defendants to judgment as a matter of law. See Samolyk v. Berthe, 251 N.J. 73, 78 (2022); Brill, 142 N.J. at 540; R. 4:46-2(c). "[C]onclusory and self-serving assertions by one of the parties are insufficient to overcome the motion." Puder v. Buechel, 183 N.J. 428, 440-41 (2005). We owe no deference to the court's legal analysis or interpretation of a statute. Palisades at Fort Lee Condo. Ass'n v. 100 Old Palisade, LLC, 230 N.J. 427, 442 (2017).

A-0697-23

"When interpreting statutory language, the goal is to divine and effectuate the Legislature's intent." Perez v. Zagami, LLC, 218 N.J. 202, 209 (2014) (quoting State v. Buckley, 216 N.J. 249, 263 (2013)). "There is no more persuasive evidence of legislative intent than the words by which the Legislature undertook to express its purpose; therefore, we first look to the plain language of the statute." Id. at 209-10. "If the language is clear, the court's job is complete." In re Civ. Commitment of W.W., 245 N.J. 438, 449 (2021) (quoting In re Expungement Application of D.J.B., 216 N.J. 433, 440 (2014)).

## A. Statutory Immunity under the Civil Commitment Statute

Title 30 "relates to the care and treatment of persons who are mentally ill, and, in particular, governs involuntary civil commitment of such individuals." Leang v. Jersey City Bd. of Educ., 198 N.J. 557, 593-94 (2009). "Included within that regulatory scheme are provisions relating to evaluation and screening of persons who are believed to be in need of involuntary civil commitment, one part of which is focused on those law enforcement and related persons who may be involved in that process." Id. at 594.

In its findings and declarations statement of the civil commitment statute, the Legislature set forth the State's "responsib[ility] for providing care, treatment and rehabilitation services to mentally ill persons who are disabled

A-0697-23

and cannot provide basic care for themselves or who are dangerous to themselves, others or property." N.J.S.A. 30:4-27.1(a). Recognizing some mentally ill people refrain from, or are unable "to benefit from voluntary treatment provided on an outpatient basis," the Legislature declared "State law" must "provide for the voluntary admission and the involuntary commitment to treatment of these persons." Ibid.

When enacting the statute, the Legislature recognized "involuntary commitment to treatment entails certain deprivations of liberty" and, as such:

> it is necessary that State law balance the basic value of liberty with the need for safety and treatment, a balance that is difficult to effect because of the limited ability to predict behavior; and, therefore, it is necessary that State law provide clear standards and procedural safeguards that ensure that only those persons who are dangerous to themselves, others or property, are involuntarily committed to treatment.
>
> [N.J.S.A. 30:4-27.1(b).]

N.J.S.A. 30:4-27.2 defines the terms at issue here. "In need of involuntary commitment," is defined as "an adult with mental illness, whose mental illness causes the person to be dangerous to self or dangerous to others or property and who is unwilling to accept appropriate treatment voluntarily after it has been offered." N.J.S.A. 30:4-27.2(m).

30

In turn:

> "Dangerous to self" means that by reason of mental illness the person has threatened or attempted suicide or serious bodily harm, or has behaved in such a manner as to indicate that the person is unable to satisfy his [or her] need for nourishment, essential medical care or shelter, so that it is probable that substantial bodily injury, serious physical harm, or death will result within the reasonably foreseeable future.
>
> [N.J.S.A. 30:4-27.2(h).]

"'Dangerous to others or property' means that by reason of mental illness there is a substantial likelihood that the person will inflict serious bodily harm upon another person or cause serious property damage within the reasonably foreseeable future." N.J.S.A. 30:4-27.2(i). Both determinations require consideration of "a person's history, recent behavior, and any recent act, threat, or serious psychiatric deterioration." N.J.S.A. 30:4-27.2(h) and (i).

Under the civil commitment statute, a mental health screener conducts an assessment to determine if "there is reasonable cause to believe that a person is in need of involuntary commitment to treatment." N.J.S.A. 30:4-27.5(d) and (e). Relevant here, law enforcement must take custody of an individual and "immediately and directly" transport the person "to a screening service" if the officer's personal observations support a "belie[f] that the person is in need of involuntary commitment to treatment," N.J.S.A. 30:4-27.6(a), or "[a] mental

health screener has certified on a form" following an "outreach visit" that the "person is in need of involuntary commitment to treatment and has requested [police transport]," N.J.S.A. 30:4-27.6(b).

Because the decision underscoring involuntarily commitment requires the exercise of discretion by mental health care professionals, the Legislature provides immunity for those professionals under N.J.S.A. 30:4-27.7.  See Ziemba, 275 N.J. Super. at 300 (recognizing "those involved in the involuntary commitment process enjoy an absolute immunity from civil or criminal liability if they acted in good faith and took reasonable steps toward effectuating the commitment").

The relevant section of the statute provides:

> A law enforcement officer, screening service, outpatient treatment provider or short-term care facility designated staff person or their respective employers, acting in good faith pursuant to [the civil commitment statute,] who takes reasonable steps to assess, take custody of, detain or transport an individual for the purposes of mental health assessment or treatment is immune from civil and criminal liability.
>
> [N.J.S.A. 30:4-27.7(a).]

A "prima facie showing that [the covered persons] acted in good faith and took reasonable steps to assess, take custody of and detain [a] plaintiff for purposes

A-0697-23

of mental health assessment or treatment" entitles a defendant to a grant of immunity and summary judgment dismissal. <u>Ziemba</u>, 275 N.J. Super. at 301.

In the present matter, the motion court found the Township defendants were entitled to statutory immunity. As to Cook, the court was persuaded the record "irrefutably demonstrat[ed]" his "conscientious, diligent, and thorough investigations and inquiries over a period of several days." The court cited Cook's observation of Post-it notes around plaintiff's home to ward off "magic," and plaintiff's statements about her neighbors' thefts, attempts to poison her, and use of magic against her. The court concluded these facts gave Cook "a good faith belief that [p]laintiff was (or was going to be) a threat to herself, others, and/or the property of others."

Plaintiff argues, "Cook acted with malice and bad faith by kidnapping plaintiff from her home and has no immunity" because he was "too racist to serve the Union Community" and "there was no legal justification for plaintiff's involuntary commitment." However, the immunity afforded under N.J.S.A. 30:4-27.7(a) does not require police to conclude a person is a danger to himself, herself, or others, provided police "take[] reasonable steps to assess" the "individual for the purpose of mental health assessment or treatment."

A-0697-23

We recognize, when deposed, Cook initially testified from his "limited . . . conversations" with plaintiff, he could not determine whether plaintiff was a danger to herself. However, based on his investigation, Cook believed "she was having a crisis and . . . needed help." He therefore contacted TRMC, which made the ultimate determination. Cook's immunity derived from that determination. See N.J.S.A. 30:4-27.7(a). We conclude the record demonstrates Cook took "reasonable steps" in commencing the assessment process. See ibid.

Similarly, we are persuaded the court correctly determined Limage and DelValle also were entitled to immunity. Plaintiff argues Limage and DelValle acted in bad faith by blocking, pushing, and forcing her to exit her home against her will. But plaintiff acknowledged at deposition the officers never touched, handcuffed, or otherwise restrained her. She also testified the officers never drew their weapons. Based on this record, we discern no basis to conclude Limage and DelValle acted in bad faith in transporting plaintiff to TRMC after Escobedo formally requested police assistance.

Because the civil commitment statute provides immunity for "law enforcement officer[s] . . . or their respective employers," the Township is also immune for the actions undertaken by Cook, Limage and DelValle. N.J.S.A.

30:4-27.7(a).  Accordingly, the Township defendants were entitled to summary judgment.

B.  Plaintiff's Civil Rights, Equal Protection, False Light, and Intentional Infliction of Emotional Distress Claims

Plaintiff asserted her constitutional right to equal protection was violated because she was illegally removed from her home based on her status as a mentally ill Haitian woman.  The New Jersey Civil Rights Act (NJCRA), N.J.S.A. 10:6-1 to -2, provides a person cannot be subjected "to the deprivation of any substantive due process or equal protection rights, privileges or immunities secured by the Constitution or laws of the United States, or any substantive rights, privileges or immunities secured by the Constitution or laws of this State."  N.J.S.A. 10:6-2(a).  The NJCRA is modeled after the analogous federal cause of action in 42 U.S.C. § 1983; New Jersey courts therefore are guided in their analysis by federal law.  See Harz v. Borough of Spring Lake, 234 N.J. 317, 330 (2018).

"To make an equal protection claim in the profiling context, [a party is] required to prove that the actions of [the state actor] (1) had a discriminatory effect and (2) were motivated by a discriminatory purpose."  Bradley v. United States, 299 F.3d 197, 205 (3d Cir. 2002).  To prove a discriminatory effect, a plaintiff must show he or "she is a member of a protected class and that [he or]

she was treated differently from similarly situated individuals in an unprotected class." Id. at 206. A discriminatory effect may further be shown by "naming similarly situated members of an unprotected class who were not" otherwise targeted. Ibid.

Here, as a brown-skinned Haitian woman, plaintiff unquestionably was a member of a protected class. See ibid. However, beyond the bare allegation that the Township defendants targeted her on the basis of race, gender, nationality, or disability, plaintiff provided no additional facts to support a discrimination claim. See Ziemba, 275 N.J. Super. at 298 (reiterating "[b]are conclusions in the pleadings, without factual support in tendered affidavits, will not defeat a meritorious application for summary judgment" (alteration in original) (quoting U.S. Pipe & Foundry Co. v. Am. Arb. Ass'n., 67 N.J. Super. 384, 399-400 (App. Div. 1961))). Further, the fact that police did not investigate plaintiff's white neighbor, without more, does not constitute a discriminatory effect or purpose. See Bradley, 299 F.3d at 206 (finding no discriminatory effect where the plaintiff, a Black woman, was selected for a luggage search at airport customs when the white male passengers were not selected).

Plaintiff's claim that her right to due process was violated fails for the same reasons. Aside from her bare allegation, plaintiff provided no other facts

or evidence to support such a claim.  See Rivkin v. Dover Twp. Rent Leveling Bd., 143 N.J. 352, 366 (1996).

As argued in her merits brief, plaintiff's false light claim against the Township defendants was premised on the forcible removal from her home by police "yelling and threatening to carry her if she refused to walk suggest[ing] to all that plaintiff was in need of involuntary commitment."[9]  To sustain a false light claim, a plaintiff must show:  "(1) the false light in which the other was placed would be highly offensive to a reasonable person; and (2) the actor had knowledge of or acted in reckless disregard as to the falsity of the publicized matter and the false light in which the other would be placed."  G.D. v. Kenny, 411 N.J. Super. 176, 195 (App. Div. 2009) (emphasis added) (quoting Leang, 198 N.J. at 589).  Plaintiff has not demonstrated the presence of police in her home supports a false light finding.  As we have concluded, police had a good faith basis to transport plaintiff to TRMC for a psychiatric evaluation.  Accordingly, there is no evidence in the record the Township defendants acted with "reckless disregard as to the falsity of the [alleged] publicized matter."  See ibid.

---

[9]  In her merits brief, plaintiff makes similar claims against TRMC for "calling six men from security to hold [her] down and injecting her against her will with a psychiatric medication."

A-0697-23

Lastly, we turn to plaintiff's claim for intentional infliction of emotional distress. To prevail on this claim "the plaintiff must establish intentional and outrageous conduct by the defendant, proximate cause, and distress that is severe." Leang, 198 N.J. at 587 (quoting Tarr v. Ciasulli, 181 N.J. 70, 77 (2004)). Again, we have concluded the Township defendants acted pursuant to N.J.S.A. 30:4-27.6 and -27.7, and plaintiff fails to allege any other facts that would support a claim for intentional infliction of emotional distress. Because the Township defendants' conduct was in accordance with the civil commitment statute, their actions cannot qualify as "outrageous." See Leang, 198 N.J. at 587.

In summary, we conclude, as did the motion court, there was insufficient evidence in the record supporting plaintiff's claims for civil rights violations, equal protection, false light, and intentional infliction of emotional distress. Accordingly, summary judgment was appropriately granted in favor of the Township defendants.

### C. Remand Proceedings

As stated, we have vacated the May 13, 2022 order only as to plaintiff's claims against Escobedo and her vicarious liability claims against TRMC. Before the motion court, the TRMC defendants failed to file a brief joining the Township defendants' summary judgment motion. As to the October 23, 2023

order, we recognize counsel for the TRMC defendants stated at oral argument he would have argued "similar things" concerning Escobedo's immunity under the civil commitment statute, and the TRMC defendants responded to plaintiff's argument on appeal.

However, when the Township defendants moved for summary judgment, the TRMC defendants were not parties to this action. Although the court referenced Escobedo's conduct in its October 23, 2023 decision, plaintiff was not afforded an opportunity to address the issue in the first instance before the motion court. Similarly, the TRMC defendants did not address plaintiff's civil rights, equal protection, false light, and intentional infliction of emotional distress claims before the motion court. Accordingly, on remand, the court shall provide the TRMC defendants and plaintiff an opportunity to brief these issues.

We leave to the court's sound discretion whether to request the parties' appellate submissions. In remanding this issue, we do not suggest a preferred result.

To the extent not addressed, any remaining arguments lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

Affirmed in part, reversed and remanded in part. Jurisdiction is not retained.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

39

A-0697-23